972 So.2d 839 (2007)
Harold A. BLAKE, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1302.
Supreme Court of Florida.
December 13, 2007.
*840 Robert A. Norgard and Andre M. Norgard of Norgard and Norgard, Bartow, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Katherine V. Blanco, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Harold Blake appeals his convictions of first-degree murder, attempted armed robbery, and grand theft of a motor vehicle, as well as his sentence of death. He raises three issues: (A) that the trial court erred in denying the motion to suppress his recorded statement; (B) that the trial court erred in failing to advise him of his right to self-representation; and (C) that his death sentence is not proportionate. As explained below, we affirm.

I. FACTS AND PROCEDURAL HISTORY
On the morning of August 12, 2002, Maheshkumar "Mike" Patel was shot and killed as he stood inside the glass doors of a convenience store, called Del's Go Mart, that he owned and operated in Winter *841 Haven, Florida. The store's video surveillance camera partially captured the shooting. The cause of death was a gunshot wound to the chest.
Witnesses testified that on August 12, 2002, at about 6 a.m., they heard a gunshot and saw a black male run and enter a light-colored car parked in front of the store. A detective found the car abandoned a little over a mile away. A K-9 tracked a scent from the car to a building in the Lake Deer Apartments. At the time, Teresa Jones was living in that complex with her children and her boyfriend, Richard Green.[1]
At about 7:00 or 7:10 that morning, Richard Green, Kevin Key, and Blake came to Teresa's home. She took Key to a store and Blake to the Scottish Inn, where he was staying. On the way, they stopped by a light-colored car on the side of the road, and Blake removed two guns from it. Blake told Teresa he had shot someone. Blake took the guns with him. Later the same day, Blake told Demetrius Jones that he, Green, and Key were attempting a robbery and someone was shot. Blake asked Demetrius to dispose of a gun, and Demetrius agreed to attempt to sell it. However, Blake did not give Demetrius the gun. At around 6 or 7 p.m. that night, Green gave Demetrius a 9 mm handgun and they attempted to sell it, but no one bought it. Later that night or early the next morning, Green threw the gun in a nearby lake.
On August 14, Detectives Louis Giampavolo and Ivan Navarro interviewed Richard Green. Green took the officers to the apartment where Blake was located, and Blake was arrested without incident. Blake began talking as soon as Giampavolo and Deputy Sheriff Kenneth Raczynski placed him in Giampavolo's car. Giampavolo read Blake his Miranda[2] rights on the way to the station. When they arrived, they placed Blake in an interview room with hidden audio and video equipment. They did not reread his Miranda rights or have him sign a waiver.
Giampavolo and Raczynski interviewed Blake. Blake said he stole a vehicle and then met Green and an unknown black male. He initially said he sold the car and was not involved with the Patel shooting. Blake then said "all three of us will get charged," made a statement about the death penalty, and began to cry. He admitted that they went to the store to commit a robbery. Blake said he was in the backseat and had a 9 mm handgun and a .38 caliber revolver. All three of the men got out of the car. Blake had the 9 mm handgun. When Patel made a sudden movement and tried to lock the door, Blake shot him. Giampavolo then asked Blake to give an audiotaped statement. Blake did not agree to taping the statement, but said he would detail the events one more time. The officers decided to videotape the statement anyway.
As seen on the videotape, Blake said he stole a car and picked up Richard Green, who was with an unknown male. Green drove to the store. The men walked up to the door of the store. Blake carried a gun with his finger on the trigger. As they approached, Patel scared him and Blake shot him with the 9 mm handgun. Blake claimed that it was an accident, however it was intended to be a warning shot. Blake acknowledged he had been treated well and that Giampavolo had read him his rights in the car:
*842 Blake was indicted for first-degree murder, attempted armed robbery, and grand theft of an automobile. At trial, he testified in his own defense. He admitted that he stole the car, but claimed that when the trio arrived at the store, he stayed in the car and heard gunshots. He claimed the entire incident was against his will.
The jury found Blake guilty of first-degree murder, attempted robbery (with a finding that he discharged a firearm resulting in death), and grand theft of a motor vehicle. At the penalty phase, the jury unanimously recommended that he be sentenced to death. After a Spencer[3] hearing, the trial court followed the jury's recommendation, finding three aggravating factors: (1) previous conviction of another capital felony or of a felony involving the threat of violence to the personfirst-degree murder and attempted robbery with a firearm (great: weight); (2) commission by a person previously convicted of a felony and under sentence of imprisonment, or placed on community control, or on felony probation (some weight); and (3) commission while the defendant was engaged in an attempt to commit the crime of armed robbery (merged with commission for financial gain) (moderate weight). The court found one statutory mitigator age of the defendant at the time of the offense (moderate weight)and seven nonstatutory mitigators: (1) appropriate courtroom behavior (some weight); (2) never displayed violence in the presence of his family, was a good son, and formed a loving relationship with his family (moderate weight); (3) remorseful for his conduct (some weight); (4) cooperated with the deputies at the time of arrest (some weight); (5) the co-participant. Richard Green was sentenced to life imprisonment (very little weight); (6) no prior violent felony convictions, except the capital felony committed two weeks prior to the death of Patel (little weight); and (7) adjustment to confinement and institutional living and no danger to the community at large if incarcerated for life (some weight). This appeal followed.

II. DISCUSSION OF LAW
Blake raises three issues: (A) that the trial court erred in denying the motion to suppress his recorded statement; (B) that the trial court erred in failing to advise him of his right to self-representation; and (C) that his death sentence is not proportionate. We address these issues below, as well as (D) sufficiency of the evidence.

A. Admissibility of the Videotaped Statement
Blake first argues that the trial court erred in denying his motion to suppress his recorded statement. The relevant facts are undisputed. Blake acknowledges that he "made two statements to law enforcement after his arrest, the second of which was video tape recorded," and that "Fun the videorecording Mr. Blake provided essentially the same factual recitation of the incident." The State agrees that Blake's statement was recorded secretly after he refused to give a taped statement.
Blake argues that by asking him to agree to a taped statement, the detective implicitly promised that his refusal would be honored, rendering the recording involuntary. Therefore, the trial court should have granted his motion to suppress his videotaped statement. In reviewing the trial court's ruling on a motion to suppress, we accord a presumption of correctness to the determination of historical facts, but "independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida *843 Constitution." Nelson v. State, 850 So.2d 514, 521 (Fla.2003) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
Many courts have held it permissible to record a confession without the defendant's knowledge or consent. See, e.g., Lester v. Wilson, 363 F.2d 824, 826 (9th Cir.1966) ("[P]olice secrecy and deception in obtaining a tape recording of incriminating statements, unassociated with a right to counsel problem or other circumstance which would render such statements inadmissible, do not present a constitutional violation."); Bell v. State, 802 So.2d 485, 485 (Fla. 3d DCA 2001) (rejecting a claim that a videotaped statement must be suppressed because the defendant was not aware that his statement was being videotaped); Davis v. State, 271 Ga. 527, 520 S.E.2d 218, 219 (1999) (finding that the failure to inform defendant that his statement was being videotaped did not render the statement involuntary); State v. Wilson, 755 S.W.2d 707, 709 (Mo.Ct.App.1988) ("Secret recordation of in-custody questioning of an accused, standing alone, is not unconstitutional."). Therefore, Blake acknowledges that the detectives could have simply recorded the statement without his consent. Nevertheless, he argues that because the detective asked him for permission and he refused, the videotaped confession was a result of an implied promise that it would not be taped.
This is a question of first impression in this Court. In fact, our research has revealed only two cases addressing this issue: Woods v. McDonough, No. 8:03-CV2336-T-27MAP, 2007 WL 1017666. (M.D.Fla. Mar.30, 2007), a recent case from the United States District Court for the Middle District of Florida; and Wilson, 755 S.W.2d at 709, a Missouri appellate court case. Although it involved an audio rather than a video recording, the circumstances in Woods are nearly identical to those here. In that case, the defendant gave oral post-Miranda statements regarding his involvement in the crime. Woods, 2007 WL 1017666, at *9. A detective asked if he would give a taped statement, but the defendant said he preferred that it not be taped. Id. at *7. Another detective nevertheless recorded the defendant's statement secretly with a small hand-held recorder. Id. The recorded portion of the interview was a summary of what the defendant already had told detectives. Id. Rejecting essentially the same argument made here, the federal district court found that the Florida trial court properly denied the defendant's postconviction claim:
At best, Petitioner alleges that he thought the detective's acceptance of his negative response when asked to give a recorded statement was an "implied promise" not to record the remainder of the interview. Standing alone, this is not sufficient to rise to the level of inducement or coercion warranting suppression of the taped interview. . . . Having knowingly and voluntarily waived his Fifth Amendment rights, and having agreed to the interview, Petitioner was not in a position to dictate the manner in which the detectives memorialized his statements.
Id. at *9. Similarly, in Wilson, the defendant argued that his confession was involuntary because an officer told him the interrogation was not being recorded when in fact it was. 755 S.W.2d at 709. A Missouri appellate court rejected the claim, stating, "We do not find this brand of trickery so offensive as to render defendant's confession involuntary." Id. at 709. For the reasons explained below, we likewise reject this claim.
In Florida, lilt is well established that a confession cannot be obtained through direct or implied promises. In order for a confession to be voluntary, the *844 totality of the circumstances must indicate that such confession is the result of free and rational choice." Johnson v. State, 696 So.2d 326, 329 (Fla.1997). "[P]olice misrepresentations alone do not necessarily render a confession involuntary." Fitzpatrick v. State, 900 So.2d 495, 511 (Fla. 2005). "[T]o establish that a statement is involuntary, there must be a finding of coercive police conduct." Schoenwetter v. State, 931 So.2d 857, 867 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 587, 166 L.Ed.2d 437 (2006); see also Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). "[T]he salient consideration in an analysis of the voluntariness of a confession is whether a defendant's free will has been overcome." Black v. State, 630 So.2d 609, 614-15 (Fla. 1st DCA 1993).
For example, confessions induced by promises not to prosecute or promises of leniency may render a confession involuntary. See, e.g., Samuel v. State, 898 So.2d 233, 237 (Fla. 4th DCA 2005) (finding a promise not to prosecute other fictional crimes rendered confession involuntary); Walker v. State, 771 So.2d 573, 575 (Fla. 1st DCA 2000) ("Where there is an express quid pro quo, i.e., a promise of protection from prosecution for cooperation, the promise of leniency alone is sufficient to render a confession or inculpatory statement involuntary"); see also Brewer v. State, 386 So.2d 232, 235 (Fla.1980) (finding a confession involuntary where the officers "raised the spectre of the electric chair, suggested that they had the power to effect leniency, and suggested to the appellant that he would not be given a fair trial."). Similarly, a confession made in return for a promise of release is involuntary. See Brockelbank v. State, 407 So.2d 368, 369 (Fla. 2d DCA 1981). However, not all police statements that arguably could be considered "promises" render a confession involuntary. For example, "[t]he fact that a police officer agrees to make one's cooperation known to prosecuting authorities and to the court does not render a confession involuntary." Maqueira v. State, 588 So.2d 221, 223 (Fla. 1991). Similarly, "a confession is not rendered inadmissible because the police tell the accused that it would be easier on him if he told the truth." Bush v. State, 461 So.2d 936, 939 (Fla.1984).
Further, a promise alone is not sufficient to render a confession involuntary. There must also be a causal connection between the police conduct and the confession. See, e.g., Connelly, 479 U.S. at 164, 107 S.Ct. 515 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). Before finding the confession inadmissible, Florida courts have repeatedly required that the alleged promise "induce," be "in return for," or be a "quid pro quo" for the confession. See, e.g., Bruno v. State, 574 So.2d 76, 79-80 (Fla.1991) ("Statements suggesting leniency are only objectionable if they establish an express quid pro quo bargain for the confession."); Evans v. State, 911 So.2d 796, 800 (Fla. 1st DCA 2005) (finding admissible a confession following a statement that the agent was not there to arrest the defendant because the "statement was not made with an intent to deceive" or "to induce a confession" and "was not the cause of the defendant's eventual confession" where there was "no quid pro quo for the alleged promise"); Green v. State, 878 So.2d 382, 385 (Fla. 1st DCA 2003) ("The comments here never rose to the level of an express quid pro quo bargain in return for appellant's confession.").
*845 Even if, as Blake argues, the request to tape was an implied promise not to tape without his permission, the totality of the circumstances do not suggest that the request constituted coercive police activity or that Blake's free will had been overcome. Before giving his initial statementwhich he concedes is "essentially the same factual recitation of the incident" reflected on the videoBlake was read his Miranda rights.[4] Asking for consent to tape a subsequent recitation of the same facts is not coercive or outrageous police conduct. While it would have been better to obtain a, written waiver of his Miranda rights, see Traylor v. State, 596 So.2d 957, 966 (Fla. 1992) (recognizing that "where reasonably practical, prudence suggests" a Miranda waiver should be in writing), Blake acknowledges on the video that he had been read his Miranda rights. Further, a review of the videotape reveals nothing in the demeanor of either Blake or of the detectives that suggests coercive conduct. Blake acknowledged that he had been treated well and that he told the truth because it was the right thing to do.
Finally, we find no causal connection between the request to tape and the confession. Again, Blake already had confessed. Although he declined to have his statement recorded, he agreed to repeat the statement to the detectives knowing that the detectives would be able to testify about it. In fact, Blake testified at trial, "I kn[e]w if I did get charged with anything it was my word against theirs." Therefore, the request to tape did not overcome Blake's will and induce his confession. For these reasons, we reject Blake's claim.

B. Trial Court's Failure to Advise of the Right to Self-Representation
Blake next argues the trial court erred in failing to advise him of his right to self-representation. We reject this claim as well.
Blake filed two pro se motions to dismiss counsel and appoint new counsel. He withdrew the first motion. The second motion alleged that counsel ignored his requests to interview witnesses and sound advice, that counsel was unwilling to pursue an "adversarial role," and that Blake lacked confidence in counsel. At a hearing on the motion, the judge asked Blake and defense counsel about the grounds alleged. He took the motion under advisement, indicating a written order would follow. The issue of self-representation did not arise. The next day, the court denied the motion "without prejudice to re-file the motion if new grounds become available."
Blake does not challenge the trial court's denial of the motion. Instead, he argues that Nelson v. State, 274 So.2d 256, 259 (Fla. 4th DCA 1973), cited with approval in Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988), required the trial court, after denying the motion, to inform the defendant of his right to self-representation. We reject this claim.
A motion to discharge counsel does not automatically require a Faretta[5] inquiry or *846 notice of the right to self-representation. State. v. Craft., 685 So.2d 1292, 1295 (Fla. 1996) (holding that Nelson and Hardwick do not require the trial court to inform a defendant of the right to self-representation after the denial of a motion to discharge counsel based on incompetence). A Faretta inquiry is triggered only by an "unequivocal assertion of the right to self-representation." Craft, 685 So.2d at 1295; see also Gamble v. Sec y, Fla. Dep't of Corr., 450 F.3d 1245, 1249 (11th Cir. 2006) (Tin order for there to be a Faretta violation, the defendant must have indicated that he wishes to conduct his own defense."), cert. denied, ___ U.S. ___, 127 S.Ct. 510, 166 L.Ed.2d 381 (2006). Blake did not at any time indicate a desire to represent himself. Therefore, the trial court was not required to inform Blake of his right to self-representation or to conduct a Faretta inquiry.
Blake's claim that the trial judge erred in failing to make his findings on the record is likewise without merit. Blake apparently interprets the phrase "[i]f no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record," Nelson, 274 So.2d at 259 (emphasis added), as requiring an oral pronouncement from the bench. Here, the trial court took the motion under advisement and the next day entered a written order denying the motion. A written order is a ruling "on the record." Blake has not cited any cases requiring an oral ruling from the bench. For these reasons, we affirm.

C. Proportionality
In his final claim, Blake argues that his death sentence is disproportionate. "Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. This Court's function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge." Connor, 803 So.2d at 612 (citation omitted). Instead, we consider the totality of the circumstances and compare them to similar capital cases where a death sentence was imposed. Id. We find Blake's death sentence proportional.
The trial court followed the jury's unanimous death recommendation and sentenced Blake to death for the first-degree murder of Mike Patel, finding three aggravators: (1) prior violent felony (great weight); (2) commission while on felony probation (some weight); and (3) commission during the course of an armed robbery merged with commission for financial gain (moderate weight). The trial court found one statutory mitigatorage of the defendant at the time of the offense ("almost 23") (moderate weight), and seven nonstatutory mitigators.
Blake does not argue that the trial court improperly found any of the aggravators, but argues that consideration of the facts underlying the factors makes them less serious. To the extent Blake is challenging the weight the trial court assigned to the aggravators, we review for an abuse of discretion. E.g., Buzia v. State, 926 So.2d 1203, 1216 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 184, 166 L.Ed.2d 129 (2006) We affirm the weight given an aggravator if based on competent substantial evidence. Id.
The first aggravating factorprior violent felonyis supported by Blake's previous conviction for first-degree murder and attempted robbery with a firearm arising out of the shooting death of Kelvin Young. The jury in that case found that Blake "personally possessed a firearm," but did not find that he "personally discharged a firearm resulting in death." Like the murder of Patel, Young's murder occurred during the course of an attempted robbery with a firearm. The two men *847 were killed with the same gun less than two weeks apart. Blake's willingness to rob Patel less than two weeks after his participation in an attempted robbery resulting in the death of Young, using the same firearm that killed Young, undermines his argument that the prior violent felony aggravator is "less significant." The weight given this aggravator is supported by competent, substantial evidence, and trial court did not abuse its discretion in assigning great weight to the prior violent felony conviction.
At oral argument, Blake's counsel argued that in establishing, the prior violent felony aggravator, the State improperly suggested that Blake shot Young, contrary to the jury's verdict in that case. To the extent the State suggested that Blake could have been Young's shooter, we certainly do not condone such conduct. However, defense counsel did not object to the evidence presented below and did not raise this issue in his briefs on appeal. Moreover, any error is not fundamental.
We further find that any inappropriate suggestion that Blake was the shooter in the prior murder was adequately rebutted in several ways. First, the jury's verdict in the prior case was attached to the judgment and sentence the State itself introduced in evidence during the penalty phase. Second, defense counsel repeatedly pointed to the verdict and noted that the jury found Blake did not discharge the firearm. Thus, the jury in this case was clearly informed of the verdict in Blake's trial for the first-degree murder and attempted robbery of Young. Finally, the trial judge expressly stated in the sentencing order that the jury in the former case found that Blake did not personally discharge the firearm. Therefore, we are confident that any inappropriate suggestion that Blake could have been the shooter in that case did not affect the jury's recommendation.
The second aggravating factor, commission while on felony probation, is based on evidence that at the time of the murder Blake was on probation for four felony offensesthree involving driving while license suspended and one involving grand theft of an automobile and driving with license suspended. Blake argues that this case is "distinguishable from those defendants who are on supervision from prior prison sentences or for violent offenses against persons." While it is true that none of Blake's prior offenses involved violence, it is also true that section 921.141(5)(a) does not require violence for this aggravator to apply. See § 921.141(5)(a), Fla. Stat. (2002) ("The capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation."). The trial court gave this aggravator only "some weight." Competent, substantial evidence supports the weight given.
The final aggravating factor was that the crime was committed while Blake was attempting to commit armed robbery, which was merged with the financial gain aggravator. The trial court gave this aggravator moderate weight. Blake argues that this aggravator will be found in every case of a robbery resulting in death. To the extent he argues that this is an automatic aggravator where a person is convicted of felony murder, we have repeatedly rejected that argument. See, e.g., Dufour v. State, 905 So.2d 42, 69 (Fla.2005) ("This Court has repeatedly rejected the argument that the murder in the course of a felony aggravator is an unconstitutional automatic aggravator.").
Blake also argues that this was not a violent confrontation. Indeed, the surveillance video shows that the shooting happened quickly and the victim was shot *848 through the glass door. However, Patel was shot and killed. Therefore, the encounter was necessarily violent. The trial court did not abuse its discretion in assigning this aggravator moderate weight.
Blake also argues that his sentence is disproportionate because the shooting was the result of a "robbery gone bad." He argues this case is like Urbin v. State, 714 So.2d 411 (Fla.1998), Livingston v. State, 565 So.2d 1288 (Fla.1988), and Terry v. State, 668 So.2d 954 (Fla.1996)all robbery-murder cases where we have reversed death sentences on proportionality grounds. For the reasons explained below, we disagree.
This case is unlike Urbin and Livingston. First, the defendants in both of those cases were minors at the time of the murders. See Urbin, 714 So.2d at 417 (comparing Urbin, to Livingston and finding "the fact that both Urbin and Livingston were seventeen years old at the time of the murders to be particularly compelling"). Blake, on the other hand, was almost 23 years old. See Shellito v. State, 701 So.2d 837, 845 (Fla.1997) (distinguishing Livingston where the defendant was 19 years old); Mendoza v. State, 700 So.2d 670, 679 (Fla.1997) (distinguishing Livingston where the defendant was 25 years old). In addition, both Urbin and Livingston involved two aggravators and relatively strong mitigation. See Urbin, 714 So.2d at 418 (finding the death sentence disproportionate where it was supported by two aggravatorsprior violent felony and commission during the course of a robbery/pecuniary gainand strong mitigation, in, eluding age, substantial impairment of the capacity to appreciate the criminality of conduct, and parental abuse and neglect); Livingston, 565 So.2d at 1292 (finding the death sentence disproportionate where it was supported by two aggravatorsprior violent felony and commission during an armed robberyand "several mitigating factors," including the defendant's age (17), severe childhood beatings and neglect, marginal intellectual functioning, and extensive use of cocaine). Here, the trial court found three aggravators and only weak mitigation. For these reasons, Urbin and Livingston are not comparable.
This case is also unlike Terry, 668 So.2d 954. In Terry, the defendant was sentenced to death in connection with a robbery-murder at a gas station. 668 So.2d at 957. The trial court found two aggravators: prior violent felony and capital felony committed during the course of an armed robbery/pecuniary gain. Id. at 965. The trial court rejected the defendant's age (21) as a statutory mitigator and also rejected the "minimal nonstatutory mitigation." Id. We found Terry to be like other "robbery-murder cases" (citing Sinclair v. State, 657 So.2d 1138 (Fla.1995), and Thompson v. State, 647 So.2d 824 (Fla. 1994)) where we had vacated death sentences. Terry, 668 So.2d at 966.
However, this case involves the same two aggravators at issue in Terry, plus an additional felony probation aggravator. More importantly, the prior violent felony in Terry was a contemporaneous conviction for acting as a principal to the aggravated assault committed by the codefendant. See Terry, 668 So.2d at 965-66 ("While this contemporaneous conviction qualifies as a prior violent felony and a separate aggravator, we cannot ignore the fact that it occurred at the same time, was committed by a codefendant, and involved the threat of violence with an inoperable gun."). Blake's prior violent felony conviction is for first-degree murder in connection with a separate attempted robbery with a firearm. We rejected a similar claim in Mendoza, 700 So.2d at 679:
In Terry and Jackson [v. State, 575 So.2d 181 (Fla.1991)], . . . the trial court found two aggravating circumstances *849 and no mitigating circumstances in imposing the death penalty. In both of those cases, we vacated the death sentences on proportionality grounds. However, in Terry and Jackson, the trial courts based prior-violent-felony aggravating circumstances upon armed robberies which were contemporaneous with the murders. By contrast, the trial court in this case based the prior-violent-felony circumstance upon appellant's previous armed robbery conviction. . . . Thus, appellant's prior conviction of an entirely separate violent crime differs from the aggravation found in Terry and Jackson.

Blake's death sentence is likewise not comparable to that vacated in Terry.
Blake also suggests that death is not proportional because the trial court did not find the heinous, atrocious, or cruel (HAC) or cold, calculated, and premeditated (CCP) aggravators. The absence of these aggravators is relevant, but is not controlling. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999). We have upheld many death sentences where neither HAC nor CCP was present. See, e.g., Bryant v. State, 785 So.2d 422, 436-37 (Fla.2001); Mendoza, 700 So.2d at 673; Melton v. State, 638 So.2d 927, 928 (Fla.1994); Freeman v. State, 563 So.2d 73, 75 (Fla.1990); Carter v. State, 576 So.2d 1291, 1293 (Fla. 1989).
We conclude that Blake's sentence is proportional to other death sentences this Court has upheld. See, e.g., Bryant, 785 So.2d at 436-37 (citing Mendoza, 700 So.2d at 673, in rejecting a "robbery gone awry" argument where the trial, court found three aggravators: (1) prior violent felonysexual battery, grand theft, robbery with a weapon, and aggravated assault with a mask; (2) commission during a robbery; and (3) avoid arrest); Mendoza, 700 So.2d at 679 (rejecting a "robbery gone awry" argument where the trial court found two aggravators: a prior violent felonyarmed robbery in connection with a separate caseand commission during a robbery); Melton, 638 So.2d at 930 (upholding a death sentence in connection with a robbery-murder, where the sentence was supported by two aggravators, including prior first-degree murder and robbery convictions); Carter, 576 So.2d at 1293 (rejecting a "robbery gone bad" argument where the trial court found three aggravators: (1) under sentence of imprisonment; (2) prior violent feloniesarmed robbery and murder; and (3) commission during a robbery); Freeman, 563 So.2d at 75 (upholding a death sentence supported by two aggravatorsprior convictions for first-degree murder, armed robbery, and burglary of a dwelling with assault, all committed, three weeks priorand corn mission during a burglary and commission for pecuniary gain (merged)).
Finally, Blake argues that his death sentence is disproportionate because Richard Green, who was convicted as a principal, received a life sentence. "In cases where more than one defendant is involved, the Court performs an additional analysis of relative culpability guided by the principle that `equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment.'" Brooks v. State, 918 So.2d 181, 208 (Fla.2005) (quoting Shere v. Moore, 830 So.2d 56, 60 (Fla. 2002)). We have rejected relative culpability arguments where the defendant sentenced to death was the "triggerman." See, e.g., Ventura v. State, 794 So.2d 553, 571 (Fla.2001) (finding codefendants not equally culpable where a codefendant hired Ventura to kill the victim, but Ventura was the triggerman); Downs v. State, 572 So.2d 895, 901 (Fla.1990) ("[E]vidence in the record supports the trial court's conclusion that Downs was the triggerman and thus was more culpable than Johnson."). Blake admitted he shot Patel. *850 The jury specifically found that Blake "personally discharged a firearm resulting in death." Therefore, we reject Blake's relative culpability argument.

D. Sufficiency of the Evidence
Blake does not contest the sufficiency of the evidence at trial, but we have an independent obligation to review the record for sufficiency of the evidence. See Fla. R.App. P. 9.142(a)(6); Rodgers v. State, 948 So.2d 655, 673-74 (Fla.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007). The jury found Blake guilty of first-degree murder on a general verdict form. "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So.2d 59, 73 (Fla.2004). The evidence in this case is detailed above. Upon review, we find competent, substantial evidence to support Blake's first-degree felony murder conviction. The evidence showed that Blake admitted that the men went to the store to commit a robbery. He further admitted that he took a 9 mm handgun to the front of the store, Patel scared him, and he shot Patel. His confession is consistent with evidence that Patel was killed by a bullet from a 9 mm handgun recovered from a nearby lake.

III. CONCLUSION
Based on the foregoing, we affirm Blake's convictions and sentence of death.
It is so ordered,
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Teresa Jones is not related to Demetrius Jones. To avoid confusion, we refer to both by their first names.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Spencer v. State, 615 So.2d: 688 (Fla.1993).
[4] Blake made various arguments below about the voluntariness of his confession, and also claimed that the officers did not read him his Miranda rights. The trial court found that he was read his Miranda rights, and also found "no evidence of coercion or promise." Blake has not challenged these findings on appeal, nor has he raised any other claims concerning his confession.
[5] Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'") (quoting Adams v. United States ex McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).