# Supreme Court of Florida

_____

No. SC12-2102
_____

**HAROLD BLAKE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-1065
_____

**HAROLD BLAKE,**
Petitioner,

vs.

**TIMOTHY H. CANNON, etc.,**
Respondent.

[December 4, 2014]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

Harold Blake appeals an order of the circuit court denying his motion to

vacate his convictions and sentences—including a conviction for first-degree

murder and sentence of death—filed under Florida Rule of Criminal Procedure 3.851. Blake also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the postconviction court's order and deny Blake's habeas petition.

## I. BACKGROUND

In 2005, Blake was convicted of first-degree murder, attempted armed robbery, and grand theft of a motor vehicle in connection with the shooting of Maheshkumar Patel on the morning of August 12, 2002. Blake v. State, 972 So. 2d 839, 840 (Fla. 2007). On appeal, this Court set out the facts of the crimes:

> On the morning of August 12, 2002, Maheshkumar "Mike" Patel was shot and killed as he stood inside the glass doors of a convenience store, called Del's Go Mart, that he owned and operated in Winter Haven, Florida. The store's video surveillance camera partially captured the shooting. The cause of death was a gunshot wound to the chest.
> Witnesses testified that on August 12, 2002, at about 6 a.m., they heard a gunshot and saw a black male run and enter a light-colored car parked in front of the store. A detective found the car abandoned a little over a mile away. A K-9 tracked a scent from the car to a building in the Lake Deer Apartments. At the time, Teresa Jones was living in that complex with her children and her boyfriend, Richard Green.
> At about 7:00 or 7:10 that morning, Richard Green, Kevin Key, and Blake came to Teresa's home. She took Key to a store and Blake to the Scottish Inn, where he was staying. On the way, they stopped by a light-colored car on the side of the road, and Blake removed two guns from it. Blake told Teresa he had shot someone. Blake took the guns with him. Later the same day, Blake told Demetrius Jones that he, Green, and Key were attempting a robbery and someone was shot.

- 2 -

Blake asked Demetrius to dispose of a gun, and Demetrius agreed to attempt to sell it. However, Blake did not give Demetrius the gun. At around 6 or 7 p.m. that night, Green gave Demetrius a 9 mm handgun and they attempted to sell it, but no one bought it. Later that night or early the next morning, Green threw the gun in a nearby lake.

On August 14, Detectives Louis Giampavolo and Ivan Navarro interviewed Richard Green. Green took the officers to the apartment where Blake was located, and Blake was arrested without incident. Blake began talking as soon as Giampavolo and Deputy Sheriff Kenneth Raczynski placed him in Giampavolo's car. Giampavolo read Blake his Miranda [v. Arizona, 384 U.S. 436 (1966),] rights on the way to the station. When they arrived, they placed Blake in an interview room with hidden audio and video equipment. They did not reread his Miranda rights or have him sign a waiver.

Giampavolo and Raczynski interviewed Blake. Blake said he stole a vehicle and then met Green and an unknown black male. He initially said he sold the car and was not involved with the Patel shooting. Blake then said "all three of us will get charged," made a statement about the death penalty, and began to cry. He admitted that they went to the store to commit a robbery. Blake said he was in the backseat and had a 9 mm handgun and a .38 caliber revolver. All three of the men got out of the car. Blake had the 9 mm handgun. When Patel made a sudden movement and tried to lock the door, Blake shot him. Giampavolo then asked Blake to give an audiotaped statement. Blake did not agree to taping the statement, but said he would detail the events one more time. The officers decided to videotape the statement anyway.

As seen on the videotape, Blake said he stole a car and picked up Richard Green, who was with an unknown male. Green drove to the store. The men walked up to the door of the store. Blake carried a gun with his finger on the trigger. As they approached, Patel scared him and Blake shot him with the 9 mm handgun. Blake claimed that it was an accident, however—it was intended to be a warning shot. Blake acknowledged he had been treated well and that Giampavolo had read him his rights in the car.

Blake was indicted for first-degree murder, attempted armed robbery, and grand theft of an automobile. At trial, he testified in his own defense. He admitted that he stole the car, but claimed that when the trio arrived at the store, he stayed in the car and heard gunshots. He claimed the entire incident was against his will.

Blake, 972 So. 2d at 840-42 (footnotes omitted).

After a penalty phase trial, the jury unanimously recommended a sentence of death for the murder conviction. The trial court held a Spencer v. State, 615 So. 2d 688 (Fla. 1993), hearing and then imposed the recommended sentence. The trial court found that three aggravating factors were applicable to the murder: (1) Blake had been previously convicted of another capital felony or of a felony involving the threat of violence—a first-degree murder and attempted robbery committed in early August 2002—(great weight); (2) Blake was previously convicted of a felony and under sentence of imprisonment, or placed on community control, or on felony probation (some weight); and (3) Blake was engaged in an attempt to commit the crime of armed robbery (merged with commission for financial gain) (moderate weight). Blake, 972 So. 2d at 842.

The court found one statutory mitigator—the defendant's age at the time of the offense (moderate weight)—and seven nonstatutory mitigating factors: (1) Blake behaved appropriately in the courtroom (some weight); (2) Blake never displayed violence in the presence of his family, was a good son, and formed a loving relationship with his family (moderate weight); (3) Blake was remorseful (some weight); (4) Blake cooperated with the deputies at the time of arrest (some weight); (5) Richard Green was sentenced to life imprisonment (very little weight); (6) Blake had no prior violent felony convictions, except for the first-degree

murder and attempted robbery that Blake committed two weeks prior to shooting Patel (little weight); and (7) Blake would adjust to confinement and pose no danger to the outside community if incarcerated for life (some weight).  Id.

Blake raised three issues on direct appeal: (1) the trial court erred in denying Blake's motion to suppress his statement to law enforcement officers on the basis that the secret recording rendered the statement involuntary; (2) the trial court erred in failing to advise him of his right to self-representation; and (3) his death sentence is not proportionate.  This Court concluded that Blake's claims were without merit and that the evidence was sufficient to support his murder conviction.  Id. at 845-50.

In 2009, Blake filed a motion for postconviction relief, which he twice amended.  In his second amended motion, Blake raised the following claims: (1) Blake was denied due process in the postconviction proceedings as a result of errors by the trial court and defense counsel; (2) trial counsel failed to adequately investigate the defense's case and challenge the State's case during the guilt phase; (3) the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and presented misleading evidence; (4) trial counsel failed to adequately investigate the defense's case and challenge the State's case during the penalty phase; (5) the prosecutor made improper comments, and trial counsel was ineffective for failing to object to the comments; (6) due to trial counsel's errors,

Blake was denied his rights under Ake v. Oklahoma, 470 U.S. 68 (1985); (7) the State violated Blake's right to due process by utilizing inconsistent theories, and trial counsel was ineffective for failing to object to the inconsistent theories; (8) newly discovered evidence establishes that Blake's first-degree murder conviction and death sentence are improper; (9) the trial court erred by allowing evidence of Blake's prior felony, and trial counsel was ineffective for failing to object to the evidence; (10) Blake's death sentence is improper because the State relied on nonstatutory aggravation, and defense counsel was ineffective for failing to object; (11) Blake's right to confrontation was violated, and trial counsel was ineffective for failing to object; and (12) cumulative error deprived Blake of a fair trial.

After conducting an evidentiary hearing, the postconviction court entered an order that denied Blake's motion to the extent that it requested a new guilt phase but granted Blake's motion to the extent that it requested a new penalty phase. State v. Blake, No. CF02-05203A-XX (Fla. 10th Cir. Ct. Aug. 31, 2012) (Postconviction Order).

In his appeal, Blake argues that the postconviction court erred by denying: (1) Blake's motion to disqualify Assistant State Attorney John Aguero and the Office of the State Attorney for the Tenth Judicial Circuit, his motion for discovery as it pertained to Aguero, and his motion for sanctions; (2) his claim that trial counsel was ineffective; (3) his claim that the State violated Brady; (4) his claim

that the State presented misleading evidence; (5) his claim that newly discovered evidence established that his conviction was unreliable; and (6) his claim that he was denied his rights under Ake.

In addition, Blake filed a petition for a writ of habeas corpus, asserting that: (1) Blake was denied a fair trial due to the service of a partial juror, and trial and appellate counsel provided ineffective assistance regarding that juror; (2) the prosecutor committed misconduct, and appellate counsel was ineffective for failing to challenge the misconduct; (3) the State's use of inconsistent theories violated Blake's right to due process, and appellate counsel was ineffective for not raising this issue; and (4) Blake was denied his rights under Ake, and appellate counsel erred by not raising the issue.

## II.  MOTION FOR POSTCONVICTION RELIEF

### A.  Disqualification, Discovery, and Sanctions

In this issue on appeal, Blake contends that the postconviction court should have granted his motion to disqualify Assistant State Attorney John Aguero and the Office of the State Attorney for the Tenth Judicial Circuit, his motion for discovery as it pertained to Aguero, and his motion for sanctions.  The postconviction court did not err in denying these motions.

### 1.  Motion to Disqualify

A ruling on a motion to disqualify is reviewed for abuse of discretion. McWatters v. State, 36 So. 3d 613, 636 (Fla. 2010). "Under the abuse of discretion standard of review, a ruling will be upheld unless the ruling is 'arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court.' " Banks v. State, 46 So. 3d 989, 997 (Fla. 2010) (quoting Lugo v. State, 2 So. 3d 1, 19 (Fla. 2008)). "Disqualification of a state attorney is appropriate 'only to prevent the accused from suffering prejudice that he otherwise would not bear.' " McWatters, 36 So. 3d at 636 (quoting Farina v. State, 680 So. 2d 392, 395-96 (Fla. 1996)). In other words, disqualification is a prophylactic remedy for likely future prejudice, not a punishment for past wrongdoing. Moreover, "[a]ctual prejudice is 'something more than the mere appearance of impropriety.' " Downs v. Moore, 801 So. 2d 906, 914 (Fla. 2001) (quoting Kearse v. State, 770 So. 2d 1119, 1129 (Fla. 2000)). In this case, the postconviction court did not abuse its discretion by denying Blake's motion to disqualify.

In September 2011, Aguero served a subpoena on Rosa Greenbaum, who at the time was working as an investigator for Blake's defense team. The subpoena, which required Greenbaum to appear before a grand jury, appeared to be related to Greenbaum's interview with Teresa Jones (Teresa), who the defense hoped would testify at the postconviction evidentiary hearing. Although Aguero agreed to

withdraw the subpoena and reissue it after Blake's evidentiary hearing, Greenbaum resigned from Blake's case and refused to testify at the evidentiary hearing.

In October 2011, Blake filed a motion to disqualify Aguero and the Office of the State Attorney. First, Blake alleged that Aguero acted in an unethical manner designed to prevent Greenbaum from testifying. Blake explained that he was prejudiced because Greenbaum had a familiarity with the case and a rapport with the witnesses that a new investigator would not be able to duplicate. Second, Blake alleged that Aguero should be disqualified because he had caused "undue interference on the ability to produce [Teresa] as a witness." Blake asserted that Aguero communicated with Teresa and that as a result of those communications, Teresa became unwilling to speak to the defense. Third, Blake alleged that disqualification was necessary because Aguero "injected himself into the litigation and will undoubtedly be a witness in Mr. Blake's postconviction case." In December 2011, Blake supplemented his motion to disqualify, alleging that Aguero's effort to have Teresa brought to Florida for her deposition was an attempt to curry favor with Teresa by enabling her to visit a sick relative.

In June 2012, the postconviction court denied Blake's motion to disqualify. The postconviction court concluded that Aguero's "actions were intended to drive Ms. Greenbaum . . . from the witness stand." State v. Blake, No. CF02-05203A-XX at 1 (Fla. 10th Cir. Ct. Jun. 18, 2012). The postconviction court also

concluded, however, that because the defense was given a nine-month delay in which to obtain and work with a new investigator, Blake was not actually prejudiced. After reviewing Teresa's deposition that was taken in January 2012 and her June 2012 testimony, the postconviction court concluded that there was no evidence that Teresa was driven from the witness stand by Aguero. The postconviction court correctly concluded that Blake has not demonstrated actual prejudice.

In Huggins v. State, 889 So. 2d 743, 768 (Fla. 2004), this Court determined that disqualification of the prosecutor was not required where the defendant was retried due to a Brady violation by the prosecutor at the original trial. This Court concluded that disqualification was unnecessary because Huggins would not bear any actual prejudice caused by the prosecutor's continued participation. This Court explained that the grant of a new trial corrected the prejudice caused by the prosecutor's misconduct and that if "[the prosecutor] had been disqualified, another prosecutor simply would have replaced him." Id. at 768-69. As a result, "disqualification would not have provided any further remedy." Id. at 768.

In contrast, disqualification is appropriate where the disqualification will prevent actual prejudice from occurring. For example, in Reaves v. State, 574 So. 2d 105, 107 (Fla. 1991), this Court concluded that the trial court should have granted a motion to disqualify a prosecutor where the prosecutor previously

represented the defendant. The Court explained that disqualification was necessary because the prior representation involved or likely involved confidential communications that were relevant to the new case. Id.

Blake's allegations relating to Greenbaum's resignation and Teresa's reluctance to testify are more similar to the allegation of prejudice in Huggins than to the allegation of prejudice in Reaves. Even if Aguero acted in bad faith when communicating with Greenbaum and Teresa, Blake did not demonstrate that if Aguero were disqualified, Greenbaum would return or Teresa would become willing to testify for the defense.

Blake's argument that Aguero should have been disqualified because Aguero was likely to be called to testify about Greenbaum and Teresa is also without merit. This Court previously concluded that disqualification is not required in such a circumstance. See Thompson v. State, 759 So. 2d 650, 666 (Fla. 2000) ("Thompson argues that the trial court should have granted defense counsel's motion to disqualify the Assistant State Attorney so that the defense could call him as a witness concerning the availability of witness Savage. However, the trial court is not required to grant a motion to disqualify just because the defense would like to call the State as a witness.").

### 2. Motion for Discovery

Also in October 2011, Blake filed a motion for discovery in which he sought leave to depose Teresa and Aguero "in relation to the contacts between [Teresa] and the State since March, 2011" and to obtain "all notes, memorandum, e-mail or recordings of the contacts between the State and [Teresa]." The motion was granted as to Teresa but denied as to Aguero. "A trial court's determination with regard to a discovery request is reviewed under an abuse of discretion standard." Overton v. State, 976 So. 2d 536, 548 (Fla. 2007).

In Rodriguez v. State, 919 So. 2d 1252, 1279 (Fla. 2005), this Court addressed a postconviction court's discretion to grant a motion to depose a judge or prosecutor and explained:

> [I]t is within the trial judge's inherent authority to allow limited prehearing discovery during postconviction proceedings. We set forth the following parameters for such discovery: the motion seeking discovery must set forth good reason; the court may grant limited discovery into matters which are relevant and material; the court may set limits on the sources and scope of such discovery; and on review of orders limiting or denying discovery, the moving party has the burden of showing an abuse of discretion. In deciding whether to allow this limited form of discovery, the trial judge must consider the issues presented, the elapsed time between the conviction and the postconviction hearing, any burdens placed on the opposing party and witnesses, alternative means of securing the evidence, and any other relevant facts.

(Internal citations and quotation marks omitted). In this case, the record of the hearing on Blake's motion demonstrates that the postconviction court considered the factors identified in Rodriguez and considered the relative burdens placed on

- 12 -

the parties. Specifically, the postconviction court recognized that Blake had a right to investigate whether there were inappropriate contacts between Aguero and Teresa but also recognized Aguero's work product privilege. In addition, the postconviction court considered whether the evidence regarding Aguero's communications with Teresa could be secured by "alternative means"—such as by deposing Teresa.

This record demonstrates that the postconviction court applied the correct legal standard when ruling on Blake's motion, and Blake has not demonstrated that it was unreasonable for the court to conclude that the defense could obtain the relevant information from Teresa. Accordingly, Blake has not demonstrated that the postconviction court abused its discretion in denying his motion.

### 3. Motion for Sanctions

Blake also filed a motion for sanctions. Based on the conduct outlined in the motion to disqualify, Blake argued that the State should provide immunity to Greenbaum and Teresa, and that if the State refused, the postconviction court should grant Blake a new trial. The State refused to grant the potential witnesses immunity, and the postconviction court denied Blake's motion for a new trial. Again, the postconviction court did not abuse its discretion by denying Blake's motion. See Lightbourne v. State, 438 So. 2d 380, 390 (Fla. 1983) (applying abuse

- 13 -

of discretion standard to trial court's denial of defendant's motion to impose sanctions as a result of a discovery violation).

Blake relies on Hendrix v. State, 82 So. 3d 1040 (Fla. 4th DCA 2011), and Lee v. State, 324 So. 2d 694 (Fla. 1st DCA 1976). Those cases are not comparable to the instant case. Hendrix and Lee, both decisions on direct appeal, addressed preserved objections to improper prosecutorial conduct that occurred at the time of trial. In Blake's case, the alleged threatening of a witness occurred during the postconviction period. Thus, the analogous remedy—if warranted—would be to restart the postconviction proceeding, not to grant a new trial for a defendant who has not shown that his convictions were unreliable.

In addition, Florida's rules and statutes do not support Blake's motion for sanctions. Florida Rule of Criminal Procedure 3.220(n)(1) provides that upon violation of a discovery rule or order, the court may order the offending party to comply with the rule, grant a continuance, grant a mistrial, prohibit the introduction of undisclosed evidence, or enter such other order as it deems just under the circumstances. Rule 3.220(n)(2) provides that upon finding a "[w]illful violation," the court may impose sanctions such as, but not limited to, contempt proceedings and the assessment of costs. Section 914.22, Florida Statutes (2011), sets out criminal sanctions for interfering with a witness's appearance or testimony. Neither the rule nor the statute contemplates that a trial court presiding

- 14 -

over a postconviction proceeding could grant the convicted defendant a new trial as a result of the prosecutor's interference with a postconviction witness.

## B. Ineffective Assistance of Counsel

In this issue on appeal, Blake argues that the postconviction court erred in denying his claim that trial counsel was ineffective during the guilt phase. Blake contends that he established that trial counsel erred by failing to sufficiently cross-examine Demetrius Jones (Demetrius), sufficiently cross-examine Teresa, call expert witnesses to testify about Blake's recorded statement, prepare Blake to testify, present evidence of Green's culpability, object to improper comments and arguments by the prosecutor, argue that Blake did not match an eyewitness description of the perpetrator, and investigate witnesses who could have established that Blake did not know a robbery was going to be attempted on August 12, 2002. This Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984). As to the first prong,

the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. For the second prong, the reviewing court must determine whether there is a reasonable probability that but for trial counsel's deficiency, the result of the proceedings would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Blake did not demonstrate that he was prejudiced by any of trial counsel's alleged errors. Accordingly, the postconviction court did not err in denying Blake's claim of guilt phase ineffective assistance of counsel.

### 1. Ineffectiveness Regarding Demetrius Jones

#### a. August 20, 2002, Statement

Blake asserts that trial counsel should have questioned State witness Demetrius about his August 20, 2002, statement to law enforcement officers. Blake claims that in that statement, Demetrius indicated that Blake stated on the morning of August 12, 2002, that Blake did not want to be involved in any robbery. Demetrius also indicated that after the shooting, Demetrius saw Green with a 9 mm handgun; Green was looking for Key to instruct Key to tell law enforcement that Key was the driver; and Green tried to help Blake leave town so that Blake would not speak to law enforcement officers about the shooting. Demetrius opined that Green attempted to shift the blame for the Patel shooting to

Blake and Key. Because Blake has not demonstrated that his trial counsel failed to ensure that admissible, exculpatory information from Demetrius' August 20, 2002, statement was presented to the jury, this allegation of deficient performance is without merit.

Demetrius' prior statements about Blake's intent were raised at Blake's trial. During cross-examination, trial counsel asked Demetrius about his August 20, 2002, statement, in which Demetrius had stated that Blake initially suggested robbing a drug dealer that he knew but then decided he did not feel like doing so.

Next, trial counsel did not err by not cross-examining Demetrius about his prior statement regarding Green's possession of the 9 mm handgun because this information was revealed during direct examination. Demetrius testified that on the morning of August 12, 2002, he saw Green with a revolver and a 9 mm handgun in the car, and that on the evening of August 12, 2002, Green gave him a 9 mm handgun.

As for Demetrius' August 20, 2002, statement about Green's desire to find Key and instruct him to confess to being the driver, the statement may have been admissible as a statement of Green's then-existing mental state, see § 90.803(3), Fla. Stat. (2005), and could be interpreted as evidence that Green was, in fact, the driver. Blake does not, however, explain how such evidence would have been helpful to his defense that while he was in the car on the morning of the shooting,

he was not the shooter. Blake does not point to any evidence—available at the time of his trial—that would have supported an argument that the driver of the car was the shooter. To the contrary, trial witness Donovan Steverson testified that upon hearing a gunshot, he looked over the fence dividing his apartment complex from the convenience store and saw a man "get in the back of the car and they sped away"; and trial witness Trisha Alderman, who also lived near the convenience store, similarly testified that she "remember[ed] seeing a man with a gun getting back in the car on the passenger's side." Further, evidence that Green was the driver would have been consistent with Blake's recorded statement to law enforcement officers, in which Blake stated that Green drove the group to the convenience store and that he, Blake, rode in the backseat. Given this record, Green's statement about intending to find Key would not have aided the defense's theory that Green was the shooter and that Blake's statement was not worthy of belief. Trial counsel is not deficient for failing to present evidence that is neither exculpatory nor impeaching. See Jimenez v. State, 997 So. 2d 1056, 1065 (Fla. 2008).

Blake also does not explain why Demetrius' speculation about why Green wanted Blake to leave town would be admissible. Demetrius would either be repeating Green's out-of-court statements or offering an inadmissible lay opinion about the purpose of Green's actions. See § 90.604, Fla. Stat. (2005) ("[A] witness

may not testify to a matter unless evidence is introduced which is sufficient to support a finding that the witness has personal knowledge of the matter."). Likewise, Blake has not established that Demetrius' opinion that Green was trying to place the blame for the shooting on Blake and Key would be admissible.

### b. Criminal History

Blake contends that defense counsel erred by failing to determine how many felony convictions Demetrius had at the time of his testimony. This claim is refuted by the record. Prior to calling Demetrius to the stand, the State, the defense, and the trial court had a sidebar discussion about how many felony convictions Demetrius had acquired since the attorneys had last questioned him at a different trial. Defense counsel requested permission from the trial court to "just double-check it with the computer?" A few moments later, defense counsel announced: "Two. That's what I'm showing." Thus, the record demonstrates that defense counsel did investigate Demetrius' felony convictions before cross-examining him.

Next, Blake contends the trial counsel should have investigated Demetrius' criminal history and ensured that the jury was given the true picture of what Demetrius hoped to gain by testifying against Blake. This claim is without merit. Blake has not established that Demetrius received any benefit from the State prior to testifying in Blake's case that was not revealed to the jury.

- 19 -

Trial counsel expressly cross-examined Demetrius on the fact that as of August 19, 2002, when Demetrius was interviewed by law enforcement about the Patel shooting, there was an outstanding warrant for Demetrius' arrest but Demetrius was not arrested. Defense counsel expressly asked Demetrius if the non-arrest "was a concession to curry favor from you in terms of you giving information," and Demetrius answered, "[y]es." As for his charges at the time of his testimony, Demetrius testified on direct examination that he had pending charges of possession of cocaine, intent to sell and deliver illegal drugs, and violation of probation. On cross-examination, defense counsel revisited this topic, asking if Demetrius was actually charged with a "crime involving selling cocaine" and "resisting an officer without violence." Demetrius agreed and admitted that he had been given pretrial release on those charges. In addition, trial counsel cross-examined Demetrius about the fact that in February 2004, he was again arrested and released for another alleged violation of probation.

Defense counsel also acted to ensure that the jury knew that Demetrius was facing the possibility of a long prison sentence but was expecting a short one. On direct examination, Demetrius stated that he knew that he was not going to be sentenced until after he testified and that while he had not been given any promises, he was hopeful that his cooperation would result in lenient treatment.

On cross-examination, this exchange occurred between defense counsel and

Demetrius:

> Q So the reason this delay has taken place in the disposition is to allow you to come testify and then after you testify and after disposition of the Blake matter then you will be sentenced, correct?
> A Yes.
> . . . .
> Q So you're looking just on that charge, possession of cocaine with intent to sell and deliver, up to 15 years in prison, aren't you?
> A Yes.
> Q And it doesn't stop there. I mean you can also get another five years for the violation of probation and the possession of cocaine; isn't that true?
> A Yes.
> Q Actually you can get another year for the resisting an officer, right?
> A Yes[,] I[] guess.
> Q So you're potentially looking at 21 years in prison, isn't that correct, just adding those three numbers?
> A Yeah, yeah, yeah.

Blake asserts that defense counsel should have cross-examined Demetrius

about the exact terms of the plea agreement he received from the State. Blake has

not established, however, that those terms could have been known at the time of

Blake's guilt phase trial. Blake was convicted on February 25, 2005, and the plea

offer to Demetrius was not signed by the prosecuting attorney until March 3, 2005.

Similarly, Blake did not establish that prior to Blake's conviction, Assistant

State Attorney Cass Castillo—the prosecutor in Blake's case—"was actively

assisting [Demetrius]." Initial Brief of Appellant at 50, Blake v. State, No. SC12-

- 21 -

2102 (May 29, 2013). Blake bases this claim on a handwritten note that appears related to a pending violation of probation case against Demetrius. The note stated: "You might want to get with Cass—def witness on murder case (?)." When asked at the postconviction evidentiary hearing if he was contacted and gave input regarding Demetrius' violation of probation case, Castillo answered "I'm confident that I didn't." Castillo added: "The only recollection I have of doing anything for [Demetrius] was, I think he got arrested for something or—and I helped get him out of jail, is what I remember doing for [Demetrius]." Blake's postconviction counsel did not, however, pursue this issue to determine when— before or after Blake's conviction—Castillo helped Demetrius. Thus, it is not known if this help occurred before Demetrius testified at Blake's trial. As a result, Blake has not established that trial counsel should have cross-examined Demetrius regarding the help, if any, he received from Castillo.

### c. Other Impeachment

Blake contends that trial counsel should have used Kelly Govia's August 16, 2002, statement to law enforcement to impeach Demetrius' testimony that after the group left early in the morning on August 12, 2002, he did not again see Blake or Green until the afternoon. Govia told law enforcement officers that between 8:30 and 9 a.m. on August 12, 2002, she observed Demetrius speaking with her niece. The niece then reported the substance of the conversation to Govia: that there had

- 22 -

been a shooting and Key was in trouble. The niece also told Govia that Demetrius had said that Green had shot someone that morning. Govia also told law enforcement officers that she heard Key say that Plump, which is Green's nickname, pulled the trigger.

Blake has not shown that trial counsel overlooked helpful, admissible evidence. Govia's statements do not contradict Demetrius' trial testimony. Demetrius could have obtained information about the shooting from a source other than Blake or Green. And any testimony from Govia or her niece that she had heard someone say that Green was the shooter would be inadmissible hearsay, which could not be used to impeach Demetrius because he did not testify about who was the shooter.

Blake's claim that reasonable trial counsel would have investigated Terrell Smith was also unproven. Blake contends that Smith's August 16, 2002, statement to Detective Ken Raczynski of the Polk County Sheriff's Office, "undercuts [Demetrius'] testimony that he saw the gun thrown in the lake." Initial Brief of Appellant at 48, Blake v. State, No. SC12-2102 (May 29, 2013). Detective Raczynski's report stated:

> [Smith] was with Green and another pecan skinned, tall male on 08/13/02 in the early evening when they came to this location. Smith stated that he stayed in the car while Green and the other subject got out of the car, ran past the boat on the shore and threw a gun into the lake.

At the evidentiary hearing, Smith testified that the third person referenced in his statement to law enforcement was not Demetrius. Blake, however, failed to allege why trial counsel should have suspected that the other male noted in Smith's statement was not Demetrius. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Here, Blake has not established that reasonable trial counsel should have known to further investigate Smith based on his August 16, 2002, statement.

## 2. Ineffectiveness Regarding Teresa Jones

### a. Plea Agreement

Blake contends that upon learning that Teresa pleaded guilty to petit theft and was sentenced to probation, Blake's trial counsel should have investigated the circumstances of Teresa's pending charge of armed robbery and what Teresa hoped to gain from cooperating with the State. Blake asserts that the timing of the plea agreement demonstrates that Teresa received a lenient sentence in exchange for her testimony against Blake. The postconviction court did not err in denying relief. Blake has not established that his trial counsel's investigation of the plea agreement or cross-examination of Teresa was unreasonable.

Prior to calling Teresa as a State witness at Blake's trial, prosecutor Castillo informed the defense that he just learned that the day before, Teresa had entered a plea in an unrelated case. The trial court bifurcated Teresa's testimony to give trial counsel an opportunity to research the plea agreement before cross-examining Teresa. The next day, the parties and the trial court further discussed the issue. Blake's trial counsel stated that he intended to cross-examine Teresa on "the fact that she was charged with a crime similar to [the crime with which Blake was charged] and that she entered a plea to a much lesser offense." Defense counsel further stated, however, that he did not intend to ask Teresa if she received the plea deal in exchange for her testimony. Trial counsel explained that after speaking with Assistant State Attorney Pickard, the prosecutor handling Teresa's robbery case, and William Sites, Teresa's attorney, trial counsel "d[i]dn't believe there's any evidence to support" that theory. Trial counsel then cross-examined Teresa about her two prior convictions involving crimes demonstrating dishonesty and inquired about her recent plea agreement. Trial counsel asked Teresa why, after being charged with armed robbery with a firearm, she was able to plead to misdemeanor petit theft. Teresa answered: "Because I was innocent."

At the evidentiary hearing, prosecutor Pickard testified that he offered Teresa the opportunity to plead guilty to petit theft and receive a sentence of six months of probation. Pickard stated that he signed the plea agreement on

November 4, 2004, and then sent it to Teresa's attorney. Pickard testified that he made the lenient offer because—based on his reading of police reports—he believed the State had a poor case against Teresa and that if he took the charge to trial, it would likely result in a directed verdict of not guilty. Pickard could not remember if, at the time of offering the plea, he was aware that Teresa was a potential witness in Blake's case, but he was aware of the connection by the time Teresa accepted the agreement on February 22, 2005. Pickard further testified that he did not have any conversations with Teresa about her cooperating with the State, and that due to the trial courts' dockets at that time, a plea offer from early November being accepted in mid-February was "about the right time frame." Attorney Sites confirmed that the plea agreement was not offered in exchange for Teresa's testimony against Blake. Sites testified that while he could not remember the dates involved, he negotiated a plea agreement on Teresa's behalf in an armed robbery case and that she accepted the offer of a misdemeanor conviction and a sentence of probation. Sites further testified that during the negotiation, there was no mention of a homicide case that involved Blake.

### b. Prior Inconsistent Statements

In this portion of his appeal, Blake contends that trial counsel was ineffective for failing to impeach Teresa with her prior inconsistent statements. Prior to testifying at Blake's 2005 trial for the Patel shooting, Teresa gave

statements to law enforcement officers on August 12, 2002, and August 14, 2002; testified before a grand jury on August 29, 2002; participated in a deposition on June 14, 2003; testified against Blake in an unrelated June 2004 trial; and testified at Green's 2004 trial for the Patel shooting. Blake has demonstrated that only minimal additional impeachment was possible. Thus, he has not shown that he was prejudiced by trial counsel's cross-examination of Teresa.

Prior to Teresa's cross-examination at Blake's 2005 trial, the trial court, the attorneys, and Teresa discussed the fact that she should not refer to Blake's 2004 trial during her testimony. To avoid revealing the unrelated homicide to the jury during the guilt phase, trial counsel Gil Colon explained to Teresa that if he intended to ask her about her testimony at a prior trial, he would ask her about her "prior testimony" or the "hearing."

Trial counsel then cross-examined Teresa about the differences between her current testimony, her 2004 "prior testimony," and her 2002 grand jury testimony. Trial counsel specifically asked Teresa about her varying statements regarding whether on August 12, 2002, she saw Blake remove two guns from the abandoned car. Defense counsel also examined Teresa about her 2004 testimony, in which Teresa stated that her 2002 testimony before the grand jury about Blake removing the guns from the car was fabricated in an effort to satisfy the law enforcement officers who investigated the case.

Blake's defense counsel did not, however, confront Teresa with an available, inconsistent statement when Teresa testified that Blake told her that he shot someone. The prosecutor asked Teresa if on August 12, 2002, Blake told her that he shot someone. Teresa answered: "Something like that." The State refreshed Teresa's memory by showing her a copy of her 2002 grand jury testimony and again asked whether Blake stated that he shot someone. This time, Teresa answered, "[y]es." Blake contends that defense counsel should have cross-examined Teresa about her 2003 deposition, in which she stated: "I didn't say nothing about no shooting. I never said nothing about no shooting. [Blake] told me he was fighting."

Trial counsel acted reasonably in not confronting Teresa with her 2003 deposition. When Teresa testified during her 2003 deposition that Blake did not admit to shooting someone, the State impeached Teresa with a prior inconsistent statement, in which she told the investigating detectives that on August 12, 2002, Blake said: "[H]e got into it with somebody. He hit him with a bat and he shot him." Accordingly, if trial counsel attempted to impeach Teresa with her 2003 deposition, trial counsel would have opened the door for the State to examine Teresa about her 2002 statement to the detectives, which was made just days after the Patel shooting. "Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal

evidence that would counter any value that might be gained from the evidence."

Johnson v. State, 921 So. 2d 490, 501 (Fla. 2005).

Blake also contends that trial counsel should have impeached Teresa with her testimony during Green's 2004 trial that she hoped that she and Green would receive a benefit from the State in exchange for their cooperation. During Blake's 2005 trial, Teresa testified that no one had promised her anything in exchange for her testimony. In contrast, during Green's 2004 trial, the following exchange occurred between defense counsel and Teresa:

> Q.  Now, Ms. Jones, have you ever been charged with anything or accused of anything in connection with this case?
> A.  No.
> Q.  And did—the police officers, did they offer you anything in any way?
> A.  As in if we was to help them?
> Q.  Um-hum.
> A.  Yes.
> Q.  What did they offer you?
> A.  That if we helped them get what they wanted, then they would help us.  They just wanted the person that shot [Patel].

Although Blake's trial counsel did not cross-examine Teresa about this testimony, her comment about expecting "help" from the State would have been cumulative. The jury was aware that Teresa had received lenient treatment from the State.

### c.  Concern for Her Children

Next, Blake argues that the postconviction court should have concluded that his trial counsel was ineffective for not questioning Teresa about whether her

testimony was motivated by a fear that if she did not assist the State, the State would attempt to take her children away from her. Blake appears to contend that if asked, Teresa would have admitted having a fear of losing her children or that if she denied having such a fear, trial counsel could have used extrinsic evidence to impeach her. Blake did not establish that reasonable trial counsel should have known about this potential bias.

During the evidentiary hearing, Blake produced a document from the Winter Haven Police Department. It was signed by a detective and dated December 13, 2002. The report read:

> On 12-09-2002, I was assigned this case for follow-up investigation. This case is a result of DCF case #02-193854, which alleges child abuse. I met with the family and found the children were normally clothed and well behaved. The apartment was orderly and there was a normal amount of food. The children appeared healthy and happy and denied any abuse or neglect. The suspect, Teresa Jones stated that she never sends her kids out at night for any reason. She feels that this was falsely reported by a neighbor who is angry at her. Case closed/unfounded.

Whether this report would tend to establish that Teresa was biased is unclear. On one hand, the report shows that Teresa's parenting was investigated by law enforcement officers shortly after the Patel shooting. On the other hand, the report clears Teresa of wrongdoing, indicating that she would no longer need to fear losing custody of her children as a result of that accusation of child abuse.

Blake also relies on the evidentiary hearing testimony of Priscilla Hatcher and Travell Jones. Hatcher testified that a few days after Blake was arrested, she observed a uniformed law enforcement officer, who she knew by the name Mouse, say to Teresa and Green: "You better come with me and I can help you out of this. You want your kids taken away? It's you or them, it's you or them, you better tell them what they want to hear, it's up to you." Travell Jones (Travell), in turn, testified at the evidentiary hearing:

> [Teresa] was more afraid of something happening to her kids, or somebody doing harm to her. So she said she wasn't going to get involved in the Court system with this and she advised me not to either at that time. So, anyway, nobody ever came forward and asked me nothing about it so I never said anything to any cops or anything about the situation and so on.

When reviewing whether counsel's investigation was deficient, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Ferrell v. State, 918 So. 2d 163, 170 (Fla. 2005) (quoting Wiggins, 539 U.S. at 527)). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant." Id. at 170 (quoting Wiggins, 539 U.S. at 533).

Here, Blake failed to demonstrate that trial counsel knew or should have known to ask Teresa whether she had any concern about State action regarding her children. The record does not establish whether the State provided the police

report to trial counsel, and Blake does not explain why trial counsel should have known to interview Hatcher or Travell about Teresa's possible bias. Furthermore, while Hatcher's comment could support the inference that Teresa testified against Blake because she feared the State would take her children, Travell's statement can be read to suggest that Teresa actually feared that Blake would harm her children if she cooperated with the State. "An ineffective assistance claim does not arise from the failure to present . . . evidence where that evidence presents a double-edged sword." Reed v. State, 875 So. 2d 415, 437 (Fla. 2004).

### d. Fear of Blake or His Family

In his last argument regarding trial counsel's examination of Teresa, Blake contends that trial counsel should have objected to or cross-examined Teresa about her testimony that she hesitated to tell the grand jury about Blake removing the guns from the car because at that time, she had received threatening phone calls and was "a little bit" afraid of Blake or his family. Blake has not demonstrated that trial counsel erred.

Blake asserts that the testimony could have been excluded under section 90.403, Florida Statutes (2005), which provided that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." This argument is without merit. The question of why

Teresa did not testify consistently at trial and before the grand jury was relevant to Teresa's credibility. The danger of unfair prejudice—that if the jurors heard that Blake or his family were making threatening phone calls, they might conclude that Blake was a violent person—did not substantially outweigh its probative value regarding Teresa's credibility.

Alternatively, Blake contends that if trial counsel failed to exclude the testimony, trial counsel should have cross-examined Teresa about her fear of Blake's family. At trial, the State asked Teresa if she was afraid of Blake or his family, and Teresa answered, "[n]ot no more, no." Blake has not explained how further questioning Teresa about her former—but no longer existing—fear would have been helpful to Blake.

### 3. Ineffectiveness Regarding Expert Witnesses

Blake argues that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to call an expert about false confessions and a mental health expert to support the defense's argument that Blake was susceptible to coercion and, as a result, his videotaped statement to law enforcement was false. The postconviction court concluded that trial counsel was not deficient for failing to hire an expert on false confessions because the postconviction court agreed with attorney Colon's conclusion that he did not need an expert to argue that Blake's recorded statement was unworthy of belief.

Regarding a mental health expert, the postconviction court concluded that Blake failed to establish prejudice. We agree that Blake did not satisfy the prejudice prong of Strickland.

At the postconviction evidentiary hearing, the defense called Dr. Richard Ofshe, a professor at the University of California, Berkeley, who specializes in the study of influence and decision-making. Dr. Ofshe testified generally about interrogation tactics that he considers psychologically coercive and then testified about Blake's statement specifically.

Based primarily on Blake's account of the interrogation, Dr. Ofshe identified several features—such as use of evidence ploys, promises of leniency in exchange for a confession, and threats of the death penalty if Blake refused to confess—that caused him to believe that the interrogation was one "that would be capable of eliciting a false confession." Dr. Ofshe next explained that Blake's statement may have been contaminated by the law enforcement officers giving Blake information about the crime before they began to record his statement. Dr. Ofshe also testified that Blake's statement was partially inconsistent with the events that could be seen in the surveillance video from the crime scene. When reenacting his approach to the door of the convenience store during his taped statement, Blake walked slowly and held an imaginary gun down to his side, whereas the surveillance tape showed a man moving quickly with a gun held at shoulder height. Similarly, Dr. Ofshe

testified that Blake could not remember details about the crime that the perpetrator would likely have known, such as how many doors there were and through which one he shot. These discrepancies prompted Dr. Ofshe to opine that the statement given by Blake "appears not to be based on his actual knowledge of what happened between the shooter and the victim."

Overall, Dr. Ofshe testified that he would have been available to consult on this case at the time of the defense's trial preparation but declined to offer an opinion regarding whether Blake's statement was in fact false. Dr. Ofshe explained: "[I]t's not for me to ever draw conclusions as to whether it's a true or false confession. I'm simply pointing out these are indicia that should be looked at and considered."

Dr. Barry M. Crown, a psychologist specializing in clinical and forensic psychology and neuropsychology, testified at the evidentiary hearing about how Blake's mental health likely affected him during his interrogation. Dr. Crown diagnosed Blake as having a neuropsychological impairment—organic brain damage primarily in the left frontal temporal area of the brain. Dr. Crown estimated that Blake functions at a fourth-grade level and described him as emotionally immature. Dr. Crown explained that Blake's difficulty with comprehension and his low verbal abilities would come into play during an interrogation. Specifically, Dr. Crown opined that Blake would be susceptible to

coercive tactics because "[h]e's easily led and directed based on his lack of intellectual efficiency." Dr. Crown agreed that Blake would be the type of subject who "would just endorse" what law enforcement told him and respond "in a way that his inquisitors wished him to respond." Based on Blake's description of the interrogation, Dr. Crown stated that he "thought that there was a strong possibility that the investigating officers, the inquisitors[,] were leading" Blake. Dr. Crown "felt that [Blake's] responses were being shaped," and expressed concern about times when, according to Blake, Blake was asked the same question repeatedly and told that he was being inaccurate until he gave a new answer.

The defense also called Dr. Shaun Agharkar, a psychiatrist, who primarily testified about Blake's mental health as possible mitigation. Dr. Agharkar diagnosed Blake as suffering from posttraumatic stress disorder, major depressive disorder, and panic disorder. Dr. Agharkar opined that due to Blake's trauma and suspected brain damage, Blake "might . . . be more likely to agree with things" and to be led during an interrogation. Dr. Agharkar further opined that Blake would be likely to believe a promise, even when, in the same circumstance, a reasonable person would not believe that promise. Dr. Agharkar admitted, however, that he did not see any moments in the videotaped statement or in the police reports that appeared to him to be instances of the law enforcement officers attempting to lead Blake to give certain responses.

These experts may have cast doubt on the reliability of Blake's videotaped statement, but they do not undermine confidence in his first-degree murder conviction. A defendant is guilty of first-degree felony murder if a person is killed when the defendant is "engaged in the perpetration of, or in the attempt to perpetrate" a robbery. § 782.04(1)(a)(2)(d), Fla. Stat. (2002). A defendant is guilty of an offense as a principal if he "aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed." § 777.011, Fla. Stat. (2002).

Blake does not dispute that an attempted armed robbery occurred and that Patel was killed in the course of that attempted robbery. Blake admitted that one of the men from the car in which he was riding approached the convenience store with the intent to rob the owner and that the man shot the owner. Blake's claim is that because he was not the shooter and he did not know that an attempted robbery was going to occur, he should not be considered a principal to the felony murder. But given the totality of the evidence, Blake's claim is patently unreasonable.

Demetrius testified that on the morning of August 12, 2002, Blake, Green, and Key discussed committing robberies—albeit not convenience store robberies—and had two guns in the car with them. The revolver was in Green's sweater, but the 9 mm handgun was visible on the car's front seat. The State presented evidence establishing that Blake's shoes contained glass fragments that

were consistent with the glass from the broken window of the stolen vehicle used in the attempted robbery and that a fingerprint from Blake was found on the vehicle.

At trial, Blake conceded that he stole a car with the intention that he, Green, and Key would use the car to transport property they intended to steal later that morning. Blake also admitted that the group had discussed committing robberies. Blake testified that after driving around, the group stopped in a parking lot and Green briefly got out of the car. Blake stated that he had a "feeling" that the group had "already planned" that they were going to rob the store, although once they arrived at the store, Blake claimed he thought the stop was for the purpose of buying cigarettes.

In addition, Donovan Steverson, who lived in an apartment complex next to the convenience store, gave testimony that tended to prove that the group cased the store from the apartment complex's parking lot before later driving into the parking lot of the store. Steverson testified that at around 5:30 a.m., he saw a man "walking through the grass to a car that was in our parking lot," and then a few minutes later, he heard a gunshot from the store and saw the same man run to the same car he had spotted earlier.

Given this evidence, any doubt about the veracity of Blake's recorded statement does not undermine confidence in the jury's conclusion that Blake either shot Patel or was a principal to felony murder.

### 4. Ineffectiveness Regarding Blake's Testimony

Blake contends that the postconviction court erred by denying Blake's claim that trial counsel erred by insufficiently preparing Blake to testify. Blake complains that trial counsel erred by allowing Blake to testify that: (1) at the time of the Patel shooting, Blake "had previous warrants for violation of probation and I was running," (2) he stole a car and that he made his living stealing cars; and (3) after the shooting, Blake went to see a friend with whom he intended to "make fake checks and bust them." Blake also asserts that trial counsel should have objected when during closing arguments, the prosecutor replayed the videotape of Blake's statement to law enforcement officers. Finally, Blake asserts that trial counsel erred by calling Blake to testify because Blake became agitated during cross-examination, which allowed the State to paint Blake in a negative light.

As for the first part of this claim, the record demonstrates that trial counsel made a reasonable strategic decision to allow the jury to hear evidence of Blake's nonviolent criminal activity. During his opening statement, Blake's counsel argued to the jury that "Harold Blake is not guilty of the charges he's charged with in total." During closing arguments, defense counsel elaborated on this theme,

arguing: "Mr. Blake is not guilty of murder. He's not guilty of attempted robbery while using a firearm. He's guilty of what he told you he was, and that is grand theft auto." This theme was repeated throughout the closing arguments. Additionally, defense counsel addressed Blake's nine felony convictions, stating: "You can have multiple convictions from a single incident or several incidents. That doesn't mean you're guilty of first-degree murder, period. It doesn't mean you're a murderer. It can mean you're a thief. It can mean all kinds of things. It doesn't mean you're a murderer."

This defense theory was reasonable. In Atwater v. State, 788 So. 2d 223, 230-31 (Fla. 2001), this Court explained that sometimes a "concession of guilt to some of the prosecutor's claims is good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury" and concluded that in Atwater's case, concession of second-degree murder was a reasonable attempt to "maintain credibility" in the face of "overwhelming evidence" that Atwater was responsible for the homicide. Similarly, in Kormondy v. State, 983 So. 2d 418, 431 (Fla. 2007), this Court concluded that trial counsel's decision to concede the defendant's guilt to robbery and burglary "was a reasonable tactical decision" where the "record demonstrate[d] that Kormondy had continually admitted his participation in the burglary and robbery."

In this case, Blake's fingerprint was on the stolen car and the State presented evidence establishing that Blake's shoes contained glass fragments that were consistent with the broken glass from the stolen vehicle. Accordingly, it was reasonable for defense counsel to attempt to maintain credibility with the jury by conceding that Blake stole the car used in the attempted robbery.

Blake also appears to assert that trial counsel erred by calling Blake to testify because Blake became agitated during cross-examination and stated that he could not recall the details of his recorded statement—which allowed the State to replay the videotaped statement. This ineffective assistance of counsel claim is insufficiently pleaded and unproven. Blake did not allege what specific actions trial counsel could have taken to help Blake control his temper or more clearly remember the details of his videotaped statement, which Blake had viewed just days before in the courtroom.

### 5. Ineffectiveness Regarding Green's Culpability

Blake argues that trial counsel was ineffective for not introducing evidence—some of which was introduced in Green's trial—that tended to prove that Green participated in planning the robbery, exited the car, approached the store with the intent to rob Patel, and possessed the 9 mm handgun after the shooting. The postconviction court did not err in denying this claim.

First, Blake argues that trial counsel should have called Angela Parker as a defense witness. At Green's trial, Parker testified that on August 12, 2002, she heard Green state that the law enforcement officers should not be conducting a homicide investigation because "the man couldn't be dead, because it didn't look like the man was shot anywhere but in the arm." Blake contends that this statement indicates that Green must have been the shooter because he was able to see Patel's injury. Blake thus asserts that if Green were unavailable to testify at Blake's trial, Parker's recitation of Green's statement would be admissible as a statement against interest, § 90.804(2)(c), Fla. Stat. (2005), and that if Green were available, Parker's testimony could be admitted to impeach Green.

Blake's argument is conclusory and without merit. Under section 90.804(2)(c), in order to introduce a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused," the offering party must establish "corroborating circumstances" to show "the trustworthiness of the statement." Blake does not address whether there were corroborating circumstances regarding Green's alleged statement to Parker. In addition, given that Green admitted being in the car at the time of the shooting, Blake has not proven that the statement would expose Green to criminal liability. Blake has not proven that a person who remained in the car could not see Patel's injury.

Furthermore, if the defense established Green's unavailability for purposes of introducing Green's out-of-court statements, the State could respond by introducing Green's 2002 grand jury testimony under section 90.804(2)(a), Florida Statutes (2005), the former testimony hearsay exception. Green's grand jury testimony would be harmful to Blake. At that proceeding, Green testified that he was riding in a stolen vehicle with Blake and a friend of Blake's on the morning of August 12, 2002. The group stopped at an apartment complex near the convenience store, and Green knew that the purpose of the stop was for Blake to "[s]cope it out" and that Blake and his friend intended to later rob the store. Green testified that when the group returned to the convenience store, Blake alone exited the car and went to the store entrance. Green stated that he did not realize Blake was going to commit the robbery until the moment Blake shot Patel. "Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence." Johnson, 921 So. 2d at 501.

Similarly, even if Green were available to testify, it was reasonable for trial counsel to not call Green as a defense witness. Blake has not shown that the statement is actually impeaching. The statement does not necessarily contradict Green's testimony that he was in the car at the time of the shooting. And again, testimony from Green would have been more harmful than helpful. While Green

recanted his testimony in 2011, at his own first-degree murder trial in 2004, which was just a few months before Blake's trial, Green testified that on the morning of August 12, 2002, Blake discussed committing a robbery and casing the convenience store. Green testified that he did not get out of the car when the group arrived at the convenience store and that Blake—who "didn't have no help" from anyone else—shot Patel. Blake has not presented any reason to believe that if Green had been called at Blake's trial, Green would not have testified as he did in 2004.

Second, Blake argues that trial counsel should have questioned Demetrius about a portion of his testimony from Green's 2004 trial. In that trial, Demetrius stated that Green announced that he planned to commit the robbery and to rush Patel at the door. Again, trial counsel acted reasonably because Demetrius' report of Green's statements, if admitted as a statement against interest or to impeach Demetrius or Green, would be more harmful than helpful. At Green's trial, Demetrius testified that Green said that he "and Mr. Blake had different plans. Like, he—he wanted to, I guess, rush him when he walked up to the door, and Blake wanted to rush him before he got to the door." This evidence would not support the defense's theory that Blake did not intend to attempt a robbery.

Third, Blake contends that trial counsel should have investigated Terrell Smith and Melburn Thomas, who told law enforcement officers that Green was in

possession of the 9 mm handgun after the crimes. Trial counsel did not err. Such evidence would not exculpate Blake or further implicate Green.

Smith testified at the evidentiary hearing that he saw Green throw the 9 mm handgun into a lake. As for Thomas, Blake relies on a report documenting that Thomas told Detective Raczynski that Thomas "saw Richard Green the day after the murder and Green was worried and told him that [a third party named] Lampley was supposed to get rid of the 9 mm when Blake gave it to him but he didn't" so Green retrieved the gun from Lampley. At Blake's trial, Demetrius testified that Green threw the 9 mm handgun into a lake. As a result, Smith's testimony would not have changed the presentation of evidence on that issue.

Fourth, Blake contends that trial counsel should have investigated Travell, who was dating Teresa after the Patel shooting, during the same period that she was dating Green. At the evidentiary hearing, Travell testified that Teresa confided in him that Green shot Patel. Blake does not, however, offer any explanation for why trial counsel should have known to investigate whether Travell had such information.

Fifth, defense postconviction exhibit 24 is a report signed by Detective Ericka Ashworth of the Polk County Sheriff's Office and signed August 16, 2002. Based on this report, Blake asserts that trial counsel should have investigated three men who were mentioned in the report: Hayward Summerall, Tyrone Summerall,

and Taron Smith. Blake contends that each could have implicated Green in the Patel shooting. Blake only called one of these men, Tyrone Summerall, at the postconviction hearing. Tyrone Summerall testified that on the day of the murder, Teresa Jones told him there had been a robbery and shooting and that Richard Green was involved. Summerall could not remember whether anyone had contacted him to testify at the time of the trial, but said he would have been available if asked. The other two men did not testify. As a result, all that is known about their knowledge of the crime is what is recorded in Detective Ashworth's report. The report indicated that: (1) Hayward stated that he had heard from "Taron" that Hayward's cousin Green was "involved with this mess" and that Green and Blake were friends; (2) Tyrone stated that he had heard that his cousin Green may have been involved in the murder and Green and Blake hung out together; and (3) another detective made contact with Taron. Because Blake has not shown that any of these men could have supported Blake's defense that Green was the shooter and Blake was unaware of the robbery plan, Blake has not shown that any failure by trial counsel to investigate Hayward, Tyrone, or Taron was unreasonable.

Blake also argues in this portion of his appellate brief that the State violated his right to due process by using inconsistent theories in his trial and in Green's trial. Green was tried first for the killing of Patel. On December 3, 2004, Green

was convicted of first-degree murder, attempted robbery with a firearm, and grand theft of a motor vehicle. Blake, in turn, was convicted on February 25, 2005, and filed his notice of appeal on June 14, 2005. Given the order of the trials, Blake could have litigated his claim asserting inconsistent theories on direct appeal, and thus, the claim is procedurally barred. See Douglas v. State, 141 So. 3d 107, 127 (Fla. 2012) ("[H]e is procedurally barred from raising these substantive claims because he could and should have raised them on direct appeal, but he failed to do so.").

### 6. Ineffectiveness Regarding the Prosecutor's Comments

Blake next contends that his trial counsel erred by failing to object to comments made by the prosecutor. The postconviction court correctly concluded that Blake did not prove deficiency.

First, Blake argues that trial counsel should have objected when, during cross-examination, the prosecutor inquired about Blake's business of "stealing property and selling it to Kay-Kay." This question was not improper because defense counsel had opened the door to the topic during direct examination. Defense counsel had elicited testimony from Blake that about two days prior to the Patel shooting, Blake had stolen some radios and pressure washers for Kay-Kay. See, e.g., Capehart v. State, 583 So. 2d 1009, 1013 (Fla. 1991) ("We find no merit to Capehart's argument that the trial court erred in permitting the state's fingerprint

expert to testify that the Florida Department of Law Enforcement confirmed his conclusions because the record shows that defense counsel 'opened the door' during cross-examination.").

Second, Blake contends that his trial counsel should have objected during the following exchange between the prosecutor and Blake.

> Q      Mr. Blake, when the detectives were speaking with you, did you start to cry?
> A      Yeah, when I get real mad, I cry.
> Q      You weren't crying because you felt bad about what happened to Mr. Patel?
> A      I feel bad what happened to him now.
> Q      Is that the reason that you were crying?
> A      At the time?
> Q      Yeah.
> A      No.
> Q      Is the only reason you were crying with the detectives is because you were angry?
> A      Because I was angry and they was harassing me.  Ain't give me no time to think.  Ain't give me no room to breathe.

Again, trial counsel cannot be considered ineffective for not objecting to the above questions because the defense opened the door to the issue of Blake's emotional state at the time of his recorded statement.  On direct, Blake repeatedly testified that he confessed to the crime because he was pressured into doing so by the detectives.

Third, Blake asserts that trial counsel should have objected when the prosecutor argued that the law enforcement officers who arrested Blake had to be "extremely cautious" and that Detective Giampavolo of the Polk County Sheriff's

- 48 -

Office wore a "bulletproof" vest because "[s]omeone had been killed by gunfire" in the crime for which Blake was being arrested. Blake does not explain on what basis trial counsel should have objected to this argument. The prosecutor's characterizations of the offense—that it involved a shooting—and of Blake's arrest were reasonable inferences from the evidence presented at trial. Specifically, Linda Raczynski, a crime scene technician for the Polk County Sheriff's Office, testified that during the autopsy of Patel's body, the doctor removed a bullet from Patel's chest, and Detective Giampavolo testified that he wore a bulletproof vest when arresting Blake. Accordingly, Blake has not shown that the prosecutor's argument was objectionable. See Bertolotti v. State, 476 So. 2d 130, 134 (Fla. 1985) ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.").

Fourth, Blake contends that trial counsel should have objected when the prosecutor commented on Blake's demeanor on the stand, suggesting to the jury that Blake's recorded statement could not have been coerced because Blake "is incapable, incapable, of being told what to do." Once again, Blake does not explain on what basis he believes counsel should have objected. Furthermore, this Court has previously concluded that no error occurred when, in arguing against a defendant's claim that his statement was involuntary, a prosecutor compared the defendant's "demeanor during his interrogation" to his "demeanor as he appeared

before [the jury] at the trial." Harris v. State, 438 So. 2d 787, 795 (Fla. 1983).

"[T]rial counsel cannot be deemed ineffective for failing to object to arguments that are proper." Rogers v. State, 957 So. 2d 538, 549 (Fla. 2007).

Fifth, Blake contends that trial counsel should have objected when the prosecutor ridiculed Blake's emotional state during his statement to law enforcement. During closing argument, after describing Blake's combative attitude on the witness stand, the prosecutor argued:

> And then all of a sudden the tape comes on and he's crying, he's bending down, he's demonstrating that he's, that he's—almost a pitiful figure on the tape. Almost a pitiful figure when he represents to you that I'm only doing this because I want to put an end to this process.
> What I would suggest to you, that what you see on that tape is Mr. Blake coming to grips with a situation that he finds himself in, that he knows he's been caught, he's made admissions to his involvement in the crime.
> He's hopeful that the officers will buy into this accident theory that he's telling them about.

While a prosecutor may "not ridicule or otherwise improperly attack the defense's theory of the case," a prosecutor is permitted to suggest to the jury that "based on the evidence of the case, they should question the plausibility of the defense's theory." Valentine v. State, 98 So. 3d 44, 55, 56 (Fla. 2012). Here, Blake put his emotional condition during his recorded statement at issue by asserting that he was coerced into confessing to the shooting, and the prosecutor questioned the plausibility of Blake's defense but does not ridicule Blake's display of emotion.

- 50 -

Sixth, Blake argues that trial counsel should have objected when, during closing arguments, the prosecutor replayed the videotape of Blake's statement. Blake does not explain on what basis trial counsel could have objected to the State reviewing the evidence admitted at trial. See McCullum v. State, 488 So. 2d 125, 126 (Fla. 3d DCA 1986) ("[T]he trial court did not abuse its discretion in permitting the prosecuting attorney . . . to play the defendant's tape recorded confession to the jury during the rebuttal portion of the prosecutor's closing argument where the recording itself had been admitted as evidence . . . and the replaying of it . . . was an appropriate response to the defense attorney's closing argument.").

Seventh, Blake argues that trial counsel should have objected to a misleading statement in the prosecutor's closing argument. Blake asserts that the prosecutor incorrectly stated that Blake's assertion during his videotaped statement that Patel had something in his hand, matched the surveillance video. Blake contends that the video actually showed that Patel put down a spray bottle that he was holding before he turned toward the door. The prosecutor argued:

> Mr. Blake makes references during the discussion, well, I swear to God that that's the truth. He gets up and he demonstrates to Detective Giampavolo how it happened and that he said [Patel] had something in his hand. Do you know what, he did have—Mr. Patel did have something in this hand. He had that kind of spray container in his hand that he had been using to prepare for the day's work in the store.

- 51 -

The prosecutor's argument did not expressly discuss the timing of when Blake claimed that Patel was holding an object, nor did he indicate that Patel continued to have the spray container in his hand when Blake shot at Patel. Blake has not shown that an objection on that basis would likely have been granted. Counsel is not ineffective for failing to raise a meritless objection. Darling v. State, 966 So. 2d 366, 384 (Fla. 2007).

### 7. Other Alleged Errors by Trial Counsel

Blake argues that trial counsel erred by not sufficiently cross-examining witness Steverson and by not arguing that Blake could not have been the shooter because he did not match Steverson's description of the likely perpetrator. This claim is refuted by the record. Steverson testified that on the morning of August 12, 2002, he saw a man who had braids exit a car near the convenience store and that after hearing gunshots, he saw a man return to the car. Blake contends that because Blake was bald and Green had braids, defense counsel erred by not emphasizing that the man who Steverson saw return to the car after the gunshots was the same man with the same braids. Trial counsel cross-examined Steverson about the perpetrator's hair and then elicited from Demetrius that in August 2002, Blake was bald but that Green and Key had dreadlocks. Trial counsel then raised this discrepancy during closing argument, stating:

> But I would suggest to you, I would submit to you, that a
> shining bald [head] like Mr. Blake even in the darkness with the street

light that was there, with the lights of the business . . . there would have been a reflection to indicate, to see it. It would have been very clear whether or not he had hair. Right?

But we have two witnesses, oh, yeah, I saw hair.

Given this record, Blake has not shown that trial counsel failed to argue that the descriptions of the perpetrator were inconsistent with Blake's appearance.

Blake asserts that his trial counsel should have interviewed Kevie Hall. Blake contends that according to Detective Raczynski's September 7, 2002, report, Hall stated that on August 12, 2002, he heard Green and Key discussing committing a robbery but that Blake was not present, which would support the defense's argument that Blake did not have an intent to commit robbery. Detective Raczynski's report does not actually address whether or not Hall identified Blake as being present at Demetrius' house during the planning of the robbery, and Hall was not called at the evidentiary hearing to elaborate on his statement. Because Blake did not establish that trial counsel failed to discover exculpatory evidence, he did not demonstrate that trial counsel's investigation was deficient. See Jimenez, 997 So. 2d at 1065 ("[T]rial counsel was clearly not deficient for the failure to discover information that was neither exculpatory nor impeaching.").

Finally, Blake argues that trial counsel should have investigated Priscilla Hatcher because she could have "described Blake's state of mind in the days following the crime and his statements that suggested that he had been unwillingly caught up in others' criminal behavior." Initial Brief of Appellant at 51, Blake v.

<u>State</u>, No. SC12-2102 (May 29, 2013). At the evidentiary hearing, Hatcher testified that after the shooting, she asked Blake if he was "involved in anything illegal" or had committed a robbery and that he answered, "no, I promise you I didn't, I didn't, I didn't." Hatcher did not provide any other testimony about Blake's state of mind or statements regarding the attempted robbery. Given that Hatcher could only provide a statement from Blake that contradicted his trial testimony that he had stolen the car and was present for the attempted robbery, Blake has not shown that defense counsel failed to investigate a helpful witness.

### 8. Cumulative Prejudice Analysis

Blake has demonstrated two areas in which his trial counsel's performance might have been deficient. Blake has established that trial counsel could have further impeached Teresa and could have called expert witnesses to support the defense theory that Blake's videotaped confession was unreliable. But even when the result of these alleged errors is considered cumulatively, our confidence in Blake's conviction is not undermined. As the postconviction court's order denying Blake's motion to disqualify noted, "[i]t is charitable . . . to find that [Teresa's] many sworn statements over the course of ten years have been inconsistent." <u>State v. Blake</u>, No. CF02-05203A at 2 (Fla. 10th Cir. Ct. Jun. 18, 2012). Accordingly, any additional impeachment of Teresa would be immaterial. And as discussed above, testimony from a false confession expert and a mental health expert would

- 54 -

not undermine the evidence establishing that Blake—even if not the shooter—was a principal to felony murder.  As a result, Blake has not proven that he was prejudiced by trial counsel's guilt phase performance.

### C.  **Brady Claims**

In his next issue on appeal, Blake argues that the postconviction court erred in denying his claims based on Brady.  To establish a Brady violation, the defendant has the burden to show (1) that favorable evidence—either exculpatory or impeaching—(2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed, the jury would have reached a different verdict.  Id. at 289.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Way v. State, 760 So. 2d 903, 910, 913 (Fla. 2000).  Claims under Brady "present mixed questions of law and fact."  Simmons v. State, 105 So. 3d 475, 499 (Fla. 2012).  The postconviction court did not err.

### 1.  **Brady Claims Relating to Teresa**

Blake argues that the State suppressed its November 4, 2004, plea offer to Teresa and failed to disclose the circumstances of the robbery with which Teresa was charged.  As is set out above, the record demonstrates that Blake's defense

counsel was able to speak to the prosecutor and Teresa's defense counsel regarding the alleged robbery and the plea offer. Blake has not demonstrated that the prosecutor misled Blake's trial counsel regarding Teresa's case or her plea agreement. As a result, Blake has not proven that the State suppressed relevant impeachment evidence.

While Blake alleged that the State should have, but failed to, disclose the police report documenting that Teresa had been investigated due to allegations of child abuse, Blake did not prove that the report was material. For the same reasons discussed in Blake's related claim of ineffective assistance of counsel, this evidence would not necessarily be impeaching and additional impeachment of Teresa would have been insignificant.

Blake also contends that the State failed to reveal that it threatened Teresa with arrest if she failed to cooperate with the State. In support of his claim, Blake produced an unsigned and undated draft of a motion to hold Teresa as a material witness. At the evidentiary hearing, prosecutor Castillo testified that he could not remember if he filed the motion but explained that if he had filed the motion, there would be a copy of it in Blake's court file. Based on this record, Blake has not established that the State threatened Teresa with arrest if she failed to cooperate and then suppressed that threat.

### 2. <u>Brady</u> Claims Relating to Demetrius

Blake contends that the State failed to disclose the plea agreement offered to Demetrius in exchange for his testimony at Blake's trial and failed to disclose that Castillo provided assistance to Demetrius. Again, as discussed above, Blake did not establish that Demetrius was given a plea offer or assisted by Castillo prior to Blake's conviction. Accordingly, Blake has not demonstrated that evidence of such a plea agreement or assistance was suppressed for purposes of Blake's guilt phase trial. See Mungin v. State, 932 So. 2d 986, 998 n.10 (Fla. 2006) ("[T]he warrants were recalled in February 1993, after Mungin's trial. The State could not suppress information that was not available.").

In addition, Blake alleges that the State failed to disclose that Demetrius was arrested on a motion to hold him as a material witness. The record refutes Blake's claim. Defense postconviction exhibit 5 included a December 19, 2003, order—from Blake's case—indicating that the trial judge held a hearing on the State's claim that Demetrius had "information material to [the] issues in the proceedings" and would conceal himself in an effort to avoid testifying. In the order, the trial court directed that Demetrius be held in custody or post bond of $10,000. The order further noted that a copy of the order was sent to "Atty Gill Colon for the defendant." Blake does not contend that for some reason this order was not delivered. Accordingly, Blake has not demonstrated that Demetrius' arrest as a material witness was suppressed.

### 3. Red Shorts

Blake asserts that the State suppressed the fact that a pair of shorts collected from Green on August 12, 2002, were red. Blake contends that while several documents produced by the State indicated that a pair of shorts had been collected from Green, only one document—titled "bench notes"—from the Florida Department of Law Enforcement (FDLE) described the color of the shorts. The postconviction court concluded that although it "seems likely that counsel was not provided with any documentation showing law enforcement had described Mr. Green's shorts as being red," Blake did not show that the State suppressed evidence with regard to the color of Mr. Green's shorts. Postconviction Order at 66. The postconviction court did not err in denying this claim.

Blake relies solely on attorney Colon's testimony that he could not "specifically remember" whether the State provided him with a copy of the bench notes to support his claim that the notes were not disclosed. "A petitioner has the burden of demonstrating each prong of a <u>Brady</u> violation." <u>Archer v. State</u>, 934 So. 2d 1187, 1202 (Fla. 2006). In <u>Archer</u>, this Court concluded that defense counsel's testimony that he "[didn't] have any independent recollection" and "[didn't] recall if [he] was aware or not" of evidence about a codefendant's involvement in a violent burglary "did not establish . . . that evidence of the Mississippi burglary was not disclosed." <u>Id.</u> at 1202-03. Likewise, here, counsel's

lack of memory does not establish that the State failed to provide defense counsel with a copy of the FDLE bench notes. Blake has offered only speculation that the State suppressed the FDLE bench notes.

## D. Misleading Evidence

Blake contends that the State violated his right to due process when it allowed Teresa to testify at Blake's trial that her statements had varied, in part because she was afraid of Blake's family. Blake contends that the State knew this testimony was misleading because it had argued a contradictory theory during Green's trial. The postconviction court did not err in denying relief. Blake's claim that the State argued inconsistent theories about Teresa's fear is procedurally barred. Green's case was tried before Blake's case. Thus, Blake could have raised this claim on direct appeal. See Douglas, 141 So. 3d at 127.

## E. Newly Discovered Evidence

To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State (Jones II), 709 So. 2d 512, 521 (Fla. 1998). Newly discovered evidence satisfies the second prong of the Jones II test if

it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So. 2d 309, 315 (Fla. 1996)).

Blake argues that the postconviction court erred in denying his claim that new statements from Green, Teresa, and Demetrius raised reasonable doubt about Blake's culpability. "While this Court has recognized that the recantation of a witness may under some circumstances qualify as newly discovered evidence, see Wyatt v. State, 71 So. 3d 86, 100 (Fla. 2011), we have also observed that recantations are, as a general matter, 'exceedingly unreliable.' " Spann v. State, 91 So. 3d 813, 816 (Fla. 2012) (quoting Bell v. State, 90 So. 2d 704, 705 (Fla. 1956)). Because the trial judge "has a superior vantage point to see and hear the witnesses presenting the conflicting testimony," this Court is "highly deferential" to the postconviction court's "determination relating to the credibility of a recantation." Id. This Court reviews the postconviction court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. Melendez v. State, 718 So. 2d 746, 747-48 (Fla. 1998). In this case, the postconviction court concluded that the newly discovered testimony given by Green, Teresa, and Demetrius was not credible. Competent, substantial evidence supports the postconviction court's credibility assessments.

### 1. Green

Green's testimony from an August 29, 2002, grand jury proceeding was entered into evidence at Green's 2004 trial for the Patel shooting. Before the grand jury, Green stated that he believed that before picking him up on the morning of August 12, 2002, Blake and Blake's friend had made a plan to case the convenience store with the intent to commit a robbery at a later time. Green explained that when the group returned to the store later that morning, Blake alone exited the car and went to the store entrance. Green testified that he did not realize Blake was actually going to commit the robbery until the moment Blake shot Patel. Green also testified at his trial. He admitted that he had told detectives that on the morning of August 12, 2002, Blake was talking about committing a robbery and casing the convenience store and that it was Blake who shot Patel. Green testified that Blake "didn't have no help" and that Green did not get out of the car.

In contrast, at the postconviction evidentiary hearing, Green testified that early in the morning on August 12, 2002, he and Blake stole a car. The pair went to Demetrius' house—where they were joined by Demetrius and Key—and all four men discussed committing a burglary or stealing. Green explained that after driving around for a while, Demetrius left and the remaining threesome parked near the convenience store. It was the idea of Green and Key to case the store and "probably rob" the owner as he entered the business. Green further testified that he, not Blake, exited the car armed with a 9 mm handgun, approached the store,

panicked, and fired a shot.  Green stated that as he exited the car, Blake had no reason to know that he was about to attempt a robbery.  Green also stated that Blake did not have a gun that day and did not shoot anyone that morning.  Green explained that he had falsely told law enforcement officers that Blake was the shooter to avoid being charged and to protect Teresa.

Green testified that he decided to reveal that he was the shooter because: "Years after being incarcerated I thought about it and realized somebody's life was on the line for something that they didn't do."  Green initially stated that Blake's investigator, Greenbaum, was the first person he told that he was the shooter.  Green explained that it had been about two years since he confessed to Greenbaum.  Subsequently, Green testified that the first person to whom he confessed was a man who worked for Blake's lawyers and that he could not remember the man's name.  When again asked who was the first person he told that he was the shooter, Green answered that he could not remember.  When the State suggested that it was a family member, Green stated that he would "rather not mention that name" and when asked again, refused to answer the question.  Next, Green clarified that while he told the male investigator about the shooting two years ago, it had only been about six months since he told Greenbaum.

Green admitted that he testified at his 2004 trial, but he could not "recall" who he testified shot Patel and that he did not remember testifying that Blake shot

Patel. When pressed, Green admitted that he had testified that he saw Blake go the door of the convenience store and shoot Patel. Finally, Green testified that he was serving life in prison for an armed bank robbery conviction and life without possibility of parole on his murder conviction.

This record supports the postconviction court's determination that Green's recantation was not credible. While the defense emphasizes that Green had a incentive to blame Blake at the time of his own trial, the State points out that Green's recantation came after Green's two life sentences had become final. In other words, Green did not admit being the shooter until he no longer had any hope of serving less than a life sentence. Moreover, Green's responses during the evidentiary hearing support the conclusion that his recantation was not credible. Green gave repeated, inconsistent answers about the circumstances in which he first revealed that he was the shooter and refused to testify about a family member that he had allegedly told about the crime. Green, incredibly, also claimed to not remember if he had testified in 2004 that Blake was the shooter.

## 2. Teresa

Blake contends that in 2012, Teresa changed her testimony about whether on August 12, 2002, Blake confessed to her that he shot someone. During Blake's 2005 trial, Teresa was asked if Blake had indicated to her that he had shot someone. Teresa initially answered, "[s]omething that like," but after being

- 63 -

confronted with her grand jury testimony, Teresa testified that Blake said that he shot someone. In her 2012 deposition, Teresa testified that Blake did not say he shot someone but "just said he beat somebody with a bat or something like that."

The record supports the postconviction court's conclusion that Teresa's 2012 deposition testimony was not as credible as her 2005 trial testimony. Teresa's 2012 testimony was internally inconsistent. Teresa insisted that her "story is still the same" but also contradicted her trial testimony.

### 3. Demetrius

At Blake's trial, Demetrius testified that he spoke with Blake, Green, and Key during the early morning hours of August 12, 2002. Demetrius stated that Blake invited Demetrius to join the group's plan to go to Lakeland to "rob people who sell drugs" and that Demetrius saw Green with a revolver and a 9 mm handgun in the car. Demetrius then explained that during the early afternoon on August 12, 2002, he saw Blake, who said that "when they tried to go do whatever they was trying to do somebody got shot." Demetrius added that Blake "didn't say who shot him or whatever, but he sa[id] somebody got shot." Demetrius testified that Blake asked Demetrius to get rid of a gun for him but did not give him the gun at that time. Instead, on the evening of August 12, 2002, Green gave Demetrius a 9 mm handgun, which Demetrius unsuccessfully attempted to sell and then gave

back to Green. Demetrius testified that later that night or early the next day, he rode with Green to a lake into which Green threw the 9 mm handgun.

On cross-examination, Blake's counsel questioned Demetrius about who was present when the plan to commit a robbery was discussed. Demetrius admitted that in a prior statement, he had said that he, Green, and Key discussed stealing and robbery before Blake arrived and that once Blake arrived, Blake suggested that they rob someone in Lakeland.

At the evidentiary hearing, Demetrius' testimony changed from his trial testimony: Demetrius admitted that he did not actually see Green throw the handgun in the lake but only heard that was what happened. Demetrius also testified that during the August 12, 2002, conversation about robbing drug dealers, Blake was not present. Demetrius testified that he could no longer remember what Blake said when they met on August 12, 2002. Demetrius also added that Key told him that Green was the person who shot Patel.

Again, the record supports the postconviction court's credibility determination. At several points in his testimony, Demetrius admitted that he could not remember clearly what happened around the time of the Patel shooting. For example, he stated: "It happened so long ago. It ain't like I just sit around and just talk[] about that everyday, what happened." In addition, Blake has not

established any basis on which Demetrius' testimony about Key's statement would be admissible at a retrial.

## F. <u>Ake</u> Claim

The postconviction court did not err by concluding that Blake's claim that he was denied the assistance of a mental health expert is procedurally barred. To the extent that Blake states a claim under <u>Ake</u>, that claim could have been raised on direct appeal. <u>See</u> <u>Raleigh v. State</u>, 932 So. 2d 1054, 1060 (Fla. 2006) ("Because an <u>Ake</u>-type claim rests on a denial of a defendant's right to due process and equal protection under the Fourteenth Amendment, it generally is procedurally barred on postconviction review because it should have been presented on direct appeal." (citation omitted)).

## III. PETITION FOR A WRIT OF HABEAS CORPUS

In his petition for a writ of habeas corpus, Blake asserts that: (1) a partial juror served on his jury, and trial and appellate counsel provided ineffective assistance regarding that juror; (2) the prosecutor committed misconduct, and appellate counsel was ineffective for failing to challenge that misconduct; (3) the State's use of inconsistent theories violated Blake's right to due process, and appellate counsel was ineffective for not raising this issue; and (4) Blake was denied his rights under <u>Ake</u>, and appellate counsel erred by not raising the issue on direct appeal.

Habeas corpus may not be used as a vehicle for presenting issues which should have been raised at trial and on appeal or in postconviction proceedings. Smith v. State, 126 So. 3d 1038, 1053 (Fla. 2013) (citing Wright v. State, 857 So. 2d 861, 874 (Fla. 2003)).  Accordingly, Blake's arguments that the trial court erred, trial counsel was ineffective, and the State presented inconsistent theories are not cognizable in his habeas petition.  These claims could have been raised on direct appeal or in his postconviction motion.

Blake's claims alleging ineffective assistance of appellate counsel are appropriately raised in a petition for a writ of habeas corpus.  Consistent with Strickland, to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine:

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

State v. Knight, 866 So. 2d 1195, 1204 (Fla. 2003) (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)).  Blake has failed, however, to show any errors or omissions by his appellate counsel.  We therefore deny his petition.

### A.  Ineffective Assistance Regarding Juror Rhodes

Blake argues that because his appellate counsel could have successfully argued that juror Rhodes' responses during voir dire created reasonable doubt

about her fitness to serve, confidence in the outcome of his trial is undermined. This argument is without merit. Blake's appellate counsel could not have raised a meritorious claim on appeal about juror Rhodes.

This Court resolved a similar claim of ineffective assistance of appellate counsel in Thompson v. State, 796 So. 2d 511 (Fla. 2001). Thompson argued that appellate counsel should have raised an issue on direct appeal about a particular juror's service on the jury. This Court concluded that because trial counsel did not challenge the juror, any claim that could have been presented on direct appeal "would have related exclusively to the trial court's failure to remove the juror on its own motion." Id. at 521. This Court further concluded that such an appellate claim could not be meritorious in Thompson's case. This Court explained that "reversible error will not be found unless the defendant establishes that 'all peremptories had been exhausted and that an objectionable juror had to be accepted' " and that Thompson's trial counsel did not use all of his peremptory strikes. Id. (quoting Pentecost v. State, 545 So. 2d 861, 863 n.1 (Fla. 1989)). Here too, Blake's appellate counsel could not have demonstrated reversible error on appeal. Blake's trial counsel used only eight of the ten preemptory strikes provided for a capital case. See § 913.08(1)(a), Fla. Stat. (2005).

**B. Ineffectiveness Regarding Prosecutor's Conduct**

Blake argues that appellate counsel was ineffective for failing to raise an issue on appeal based on the prosecutor's questioning of Teresa about her fear of Blake and his family, the prosecutor's questioning of Blake about his crimes, the prosecutor's questioning of Blake about why he cried during his videotaped statement, and the prosecutor's closing argument about the circumstances of Blake's arrest and Blake's demeanor. As is explained in the context of Blake's postconviction claim that trial counsel was ineffective for not objecting to these questions and arguments, Blake has not identified any questions or arguments that were improper. Accordingly, he has not shown that appellate counsel failed to raise a meritorious issue on appeal. See Rutherford v. Moore, 774 So. 2d 637, 649 (Fla. 2000) ("Appellate counsel cannot be considered ineffective for failing to raise issues on appeal that would have been found to be meritless.").

### C. Ineffectiveness Regarding Inconsistent Theories

Blake argues that his appellate counsel should have challenged the State's use at Green's trial and Blake's trial of inconsistent theories regarding Green's culpability and Teresa's fear of Blake. This claim is without merit. Even assuming that codefendants have a right to consistent theories of prosecution, Blake has not established that the State argued inconsistent theories.

During closing argument in Green's trial, the prosecutor argued that the evidence established that Green and Blake both exited the car and approached the

convenience store, but "Mr. Green had returned [to the car] thinking that there wasn't going to be a robbery, but Mr. Blake continued on. . . . Blake continues on and fires a shot through the glass. . . ." After clarifying that "[f]elony murder is the [type of murder] we're talking about in this case," and discussing the concept of being a principal to felony murder, the prosecutor argued that "both Richard Green and the person who killed Maheshkumar Patel were principals in the commission of attempted robbery." Within this context, the prosecutor urged the jury to consider "[w]hat did Richard Green do before the crime was committed to assist, to encourage, aid Mr. Blake?" The prosecutor asserted that the jury should reach the "inescapable conclusion" that "Richard Green and Harold Blake were in league with one another to rob from Mr. Patel; [and] to steal, as a preliminary matter, the vehicle . . . to facilitate that robbery."

During closing argument in Blake's trial, the prosecutor argued that both Green and Blake were guilty of felony murder.

> If Mr. Green and Mr. Blake and Mr. Ke[y]—frankly focusing on Green and Blake now because they've been the primary focus of the trial—both intended to commit the crime of robbery of Mr. Patel and they drove to that store and they, and they armed themselves with firearms and one of them, either one of them under felony murder, goes to that door and in the process of approaching the door and gaining entry in the business shoots and kills Mr. Patel, that is an attempted robbery.
> And because Mr. Patel was killed as a consequence of and while that attempted robbery was being done, both of them, both of them are guilty of first-degree murder.

So the true issue of that is whether Mr. Blake took part [in] that attempted robbery. That's the true issue with respect to felony murder.

The State argued at both trials that Blake and Green both participated in planning the robbery, that both were guilty of first-degree murder, and that Blake was the person who shot Patel. While the State focused on Green's role in the crime during Green's trial and discussed Green to a lesser extent in Blake's trial, the State did not argue inconsistent theories of culpability.

Blake also cannot demonstrate that the State argued inconsistent positions about Teresa's fear. Blake contends that the State made an argument during Green's trial which was inconsistent with Teresa's testimony at Blake's trial that she hesitated to tell the grand jury about Blake removing the guns from the car because, at that time, Teresa was "a little bit" afraid of Blake or his family due to her receipt of threatening phone calls. The argument from Green's trial, however, is about Teresa's motivation for omitting any mention of Green from her August 12, 2002, statement to law enforcement officers:

> Hearken, if you will, back to the testimony of Ms. Jones when I was questioning her, and I said, Ms. Jones, do you recall the first time the officers talked with you on the 12th? And she said yeah. And you called him Blade. She mentions the name of Harold Blake the first time, the very first time they talked. Who does she leave out? Her boyfriend.
> If fear was her motive, if fear was her motive she would have left out [Harold] Blake, or Blade as she knew him, that's who would have been left out. That wasn't her motive. Her motive was to

- 71 -

> protect Mr. Green, and that's who she leaves out of her initial conversation with the police.
>
> So, you see, it's not true about fear.  This is about protection, protecting someone that was close to her, and that would have been Mr. Green.

The State's argument does not address why Teresa hesitated to implicate Blake in her testimony before the grand jury.  Moreover, during its closing argument in Green's case, the State reviewed the testimony indicating that when testifying before the grand jury, Teresa expressed that she feared Blake's family.  Given this record, Blake has not demonstrated that Teresa's trial testimony was false or misleading.

### D.  Ineffectiveness Regarding Right to Mental Health Evaluation

In his final habeas claim, Blake asserts that his appellate counsel should have argued that his rights under Ake were violated.  Blake does not, however, state a prima facie claim under Ake that could have been raised by appellate counsel.  In Ake, 470 U.S. at 83, the United States Supreme Court "h[e]ld that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination."  Blake complains that his trial counsel erred by not attempting to retain certain mental health experts, but he does not allege that the trial court denied a request to appoint a mental health expert or provided an incompetent

mental health expert. Because he did not allege a claim under <u>Ake</u>, Blake has not demonstrated that appellate counsel failed to raise a viable issue. <u>See</u> <u>Rutherford</u>, 774 So. 2d at 649.

## IV. CONCLUSION

For the reasons stated above, we affirm the postconviction court's order that denied Blake's request for a new guilt phase trial and deny his petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Polk County,
        Roger Allan Alcott, Judge - Case No. 532002CF005203A0XXXX
And an Original Proceeding – Habeas Corpus

Linda McDermott of McClain & McDermott, P.A., Estero, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Katherine Vickers Blanco, Assistant Attorney General, Tampa, Florida,

        for Appellee/Respondent